In re FASHION WORLD, INC., d/b/a Stacey's, Debtor.

FASHION WORLD, INC., d/b/a Stacey's, Plaintiff,

and

Fashion Gallery, Inc., Plaintiff/Intervenor,

v.

William G. FINARD and Mildred K. Finard, as Trustees of Finard Realty Trust, Defendants.

Bankruptcy No. 84–00458–HL. Adv. No. 84–0234.

United States Bankruptcy Court, D. Massachusetts.

Nov. 15, 1984.

---

Mark N. Polebaum, Hale & Dorr, Boston, Mass., for debtor.

Joseph Landis, P.C., Boston, Mass., for William G. Finard and Mildred K. Finard.

Paul D. Moore, Foley, Hoag & Eliot, Boston, Mass., for Fashion Gallery, Inc.

Stephen M. Richmond, Kaye, Fialkow, Richmond & Rothstein, Boston, Mass., for creditor.

## MEMORANDUM ON FRAUDULENT TRANSFER

HAROLD LAVIEN, Bankruptcy Judge.

Trial was held on this matter on October 3, 1984. Each party was provided, and took advantage of, the opportunity to provide the Court with post-trial and reply briefs. Accordingly, I make the following findings of facts and rulings of law.

On January 19, 1979, the debtor, Fashion World, Inc., entered into a lease with the defendants for a store located at the intersection of Routes 9 and 27 in Natick (the "Natick Store"). The Natick Store was one of several in a shopping center owned by the defendants and contained 5,850 square feet. The basic annual rent for the first year was $32,175 or $5.50 per square foot, plus a proportionate share of the real estate taxes, a common area maintenance charge, and 5% of its gross sales in excess of $650,000 for any lease year.[1] The lease had a term of ten years and was renewable, at the option of the debtor, for two additional five-year periods.

On January 6, 1984, the debtor and the defendants entered into the disputed agreement, pursuant to which the defendants had the option to terminate the Natick Lease upon 30-day notice to the debtor.[2] Further, it was agreed:

(i) that defendants "will seek out new tenants for the premises leased to [debtor] by the aforesaid leases, and that [defendants] would not seek out such new tenants without the execution and delivery by [debtor] of this agreement;"

(ii) that the agreement was being executed by debtor "as an inducement to [defendants] to seek out such new tenants, and that [defendants] shall rely upon this instrument in so doing;" and

(iii) that "[n]othing herein contained, however, shall be deemed to impose upon [defendants] any duty to exercise it termination right set forth

---

1. At no time did the debtor ever exceed sales of $650,000 for a lease year.

2. The January 6th agreement was the culmination of discussions that began in the summer of 1983. Those discussions first centered on premises located in Saugus, managed by the defendants through Saugus Realty Co. and leased to the debtor. The Natick lease and Saugus lease are similar. Apparently, the Saugus store was an unprofitable venture, although the Natick store was at lease marginally profitable. For reasons not apparent to the Court, the initial discussions were broadened to include the Natick store, and the January 6th agreement included both the Saugus store and Natick store. It is probable that the continual worsening financial condition of the debtor caused the debtor to acquiesce to the inclusion of the Natick lease. However, it is just this situation of undue creditor pressure which results in a transaction without fair consideration while the debtor is insolvent that fraudulent conveyance statutes are designed to remedy.

herein under any circumstances whatsoever."

Efforts by the defendants to find new tenants were minimal over the next few months. No potential tenants were shown the premises and perhaps some thirty hours were expended by the defendants in this regards. No substitute tenant was found. On April 2, 1984, the debtor filed its Chapter 11 petition. On June 28, 1984, the debtor filed a complaint seeking to avoid the January 6th agreement as a fraudulent transfer pursuant to 11 U.S.C. § 548. On July 12, 1984, the Court confirmed the debtor's plan of reorganization whereby Fashion Gallery, Inc., a division of Spencer Corporation, obtained substantially all of the operating assets of the debtor. Subsequently, Fashion Gallery, Inc., filed a Motion to Intervene in the adversary. On October 1, 1984, the Court issued a memorandum and order interpreting the debtor's plan of reorganization that gave Fashion Gallery, Inc. the exclusive right to pursue the instant action.

11 U.S.C. § 548, in pertinent part, reads:
(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor—
(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
(B)(1) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation....

■ It has been stipulated, and I so find, that the January 6th agreement constituted a transfer of the debtor's property which occurred on or within one year prior to the debtor's Chapter 11 petition and that the debtor was insolvent as of January 6, 1984. Accordingly, two of the three elements necessary for a finding of a fraudulent transfer are undisputed and found, leaving a single remaining issue—whether the debtor "received less than a reasonable equivalent value in exchange for" the January 6th agreement.

At trial, Fashion Gallery's evidence established that the Natick lease was substantially below market rates. Specifically, Fashion Gallery presented the expert testimony of Donald Reenstierna. He testified that he estimated the market rent for the Natick store at $13 per square foot as of January, 1984, compared to the contract rate of $5.50 per square foot. This, according to him, resulted in a present value of the debtor's interest in the Natick lease and store, of $261,056.[3] These opinions were based upon his extensive professional experience with similar appraisals in the Natick area as well as the New England area, examination of the Natick Store, comparison of rates charged in the same shopping center, as well as a comparison of similar rates in neighboring sites.

■ By providing the defendant/landlord with a right to terminate upon 30-day notice, the debtor was, in effect, transferring its interest in the lease and its $260,000 value. For the Court to find in favor of the defendants, the Court would have to find that the defendants provided "reasonably equivalent value" in exchange for the leasehold interest—that is consideration that approached, in value, $260,000. However, no such consideration can be found in the January 6th agreement. All the defendants agreed to do was to seek out new tenants for the premises—in essence, to "mitigate damages". Although mitigation of damages may or may not be a legal

---

3. Mr. Reenstierna computed that value by multiplying the difference between market value and the lease rate ($13 – $5.50 = $750) × 5,850 square feet, discounted to present value at a rate of 15% over the remaining 16 years of the Natick lease (5.95 discount factor). The January, 1984 market rate was assumed to remain constant throughout the 16-year period, with no adjustment for anticipated future increases or inflation. Mr. Reenstierna made no adjustment for percentage rates because his review of published industry sales information indicated that the level of sales at which percentage rent was a factor was not likely to be achieved by the debtor or another tenant in the same line of business.

obligation to which the defendants are legally bound without any specific agreement depending upon the circumstances, *Fifty Associates v. Berger Dry Goods Co.,* 275 Mass. 509, 176 N.E. 643 (1931); *Edmands v. Rust & Richardson Drug Co.,* 191 Mass. 123, 77 N.E. 713 (1906); Stavisky, 34 Mass. Practice, Landlord and Tenant Law § 1046; it is difficult to find the value of the consideration where the *defendants* would gain some $260,000 merely by terminating the lease and reletting to new tenants at an increased rent. Moreover, by the terms of the Janury 6th agreement, the defendants, despite their promise to seek tenants, were under no obligation to terminate the lease. *See also, Cole v. Loma Plastics, Inc.,* 112 F.Supp. 138 (N.D. Tex.1953)˙ (an executory promise does not constitute value).

At trial, and in his briefs, counsel for the defendants argued that the lease did not have a $260,000 value because the lease was not freely assignable by the debtor/tenant. Specifically, the lease provided:

18. Tenant agrees that it will not assign, mortgage, pledge or otherwise encumber this lease or any interest therein, or sublet the whole or any part of the demised premises, without obtaining on each occasion the written consent of the Landlord. (See Article 42.)

42. Notwithstanding anything to the contrary contained in Article 18 hereof, Landlord agrees that unless Landlord shall terminate this lease as below set forth, Landlord shall not *unreasonably* withhold its consent to any assignment of Tenant's interest in this lease for the use specified in Exhibit C hereof.... Prior to any such assignment, Tenant shall give Landlord notice of the name of the proposed assignee, and Landlord may terminate this lease by giving Tenant notice of termination prior to the expiration of sixty days after Landlord shall receive such notice from Tenant.

Accordingly, counsel argues, if the debtor attempted to assign the lease, the landlord had the option of rejecting the lease and terminating the tenancy. Thus, being unable to assign the lease, the lease could not possibly have a value of $260,000 and, in fact, was valueless.

The lease was clearly not valueless and if the Court were to find a value less than $260,000, the result would not be altered, for if there was a gossamer promise, it was that embodied in the January 6th so-called agreement which relieved the debtor of none of its legal obligations and obligated the landlord to do nothing to its detriment, unless seeking, at no risk to it, the possibility of obtaining a higher rental from a more financially stable tenant can by some process of double think be a burden that the average landlord would have to be coerced into undertaking as running against his normal altruistic nature.

Further, the explicit language of the lease provides that the landlord cannot *"unreasonably* withhold its consent to any assignment of [the] Tenant's interest." A fair reading of this language dictates that the landlord/defendant's right to withhold consent is narrowly circumscribed. Moreover, it is well-settled Massachusetts law that "[a] covenant permitting ... assignment with the consent of the lessor ... is a convenant for his benefit and is to be construed more strongly against him...." *Granite Trust Bldg. Corp. v. Atlantic & Pacific Tea Co.,* 36 F.Supp. 77, 78 (D.Mass. 1940); *See Mutual Paper Co. v. Hoague-Sprague Corp.,* 297 Mass. 294, 300, 8 N.E.2d 802 (1937); *Standard Sanitary Mfg. Co. v. Hartfield Realty Co.,* 284 Mass. 540, 546, 188 N.E. 220 (1933); *Watts v. Bruce,* 245 Mass. 531, 534, 139 N.E. 650 (1923). Further, it is generally an accepted equitable principle that restraints against alienation are not favored. *See, e.g., Boss Barbara, Inc. v. Newbill,* 97 N.M. 239, 638 P.2d 1084, 1086 (1982) ("Reasonable restraints upon the alienation of property are to be strictly construed...."); *Funk v. Funk,* 102 Idaho 521, 633 P.2d 586, 589 (1981) ("restraints on alienation of leased property are looked upon with disfavor and are strictly construed against the lessor"). Moreover, although Massachusetts courts have not yet dealt with the issue, it is unlikely that consent may be reasonably

denied merely because the landlord wishes to benefit from an increased rent. *See, e.g., Ringwood Associates, Ltd. v. Jack's of Route 23, Inc.*, 153 N.J.Super. 294, 379 A.2d 508, 512 (1977) ("The fact that the lessor could obtain a higher rent under a new lease agreement but not under an assignment of [the tenant's] lease did not justify the lessor's refusal to consent to the assignment.... It appears...that lessor's sole reason for refusing to consent to the assignment was the desire to improve its economic condition through its proffered direct rental of the premises to [the proposed assignee] under a new lease at a higher rent. On these facts, the lessor acted unreasonably in refusing to consent to the assignment."); *Cowan v. Chalamidas*, 98 N.M. 14, 644 P.2d 528, 531 (1982); *Gamble v. New Orleans Housing Mart, Inc.*, 154 So.2d 625, 627 (La.App.1963); *Funk v. Funk*, 633 P.3d at 589 ("no desirable public policy is served by upholding a landlord's arbitrary refusal of consent ... where, as here, it is apparent that the refusal to consent was withheld for purely financial reasons and that the landlord wanted the lessees to enter into an entirely new lease agreement with substantially increased financial benefits to the landlord"); *Fernandez v. Vazquez*, 397 So.2d 1171, 1174 (Fla.Dist.Ct.App.1981) ("[d]enying consent solely ... in order that the landlord may charge a higher rent than originally contracted for [has] been held [an] arbitrary reason ... failing the tests of good faith and reasonableness under commercial leases"); *Schweiso v. Williams*, 150 Cal.App.3d 883, 886, 198 Cal. Rptr. 238 (1984); *Chanslor-Western Oil & Dev. Co. v. Metropolitan Sanitary Dist.*, 131 Ill. App.2d 527, 266 N.E.2d 405, 408 (1970) ("[W]e hold that [the landlord's] withholding of consent on the condition of reappraisal and establishment of a new rent schedule is arbitrary and unreasonable"). Accordingly, the debtor would appear to have a distinct right to assign the remainder of the lease.

The landlord's argument for a contrary reading of the language cuts two ways. Since not only should such terms as would lead to a forfeiture are to be strictly construed against their author, the Court notes that the provisions in Article 42 dealing with the landlord's right to terminate on being advised of a completed assignment do not include the entirely separate and distinct legal concept of a subletting.

It is, of course, elementary that apart and separate from the doctrine of assignment, there is an entirely distinct doctrine of subleasing. The debtor had the right to sublet and, by definition, that could include all but a small portion of the premises or a short limit on the term. *Marcelle, Inc. v. Sol. & S. Marcus Co.*, 274 Mass. 469, 472, 175 N.E. 83 (1931); Lesar, 1 American Law of Property, § 3.57, p. 299 n. 12 (1952); 1 Tiffany, Real Property § 123 (3d Ed.1939). Article 18 does provide that the debtor may sublet only upon consent of the landlord/defendants. Although Article 42 does not direct that such consent cannot be withheld unreasonably, the Courts have consistently so interpreted the tenant's right. True, no Massachusetts state court has squarely dealt with this issue; however, the United States District Court for Massachusetts has noted, in applying Massachusetts law,:

It would seem to be the better law that when a lease restricts a lessee's rights by requiring consent before these rights can be exercised, it must have been in the contemplation of the parties that the lessor be required to give some reason for withholding consent

*Granite Trust Bldg. Corp. v. Great Atlantic & Pacific Tea Co.*, 36 F.Supp. 77 (D.Mass.1940). Further, this would appear to be the law in most, if not all, other jurisdictions. *See, e.g., Prestin v. Mobil Oil Corp.*, 741 F.2d 268, 271 (9th Cir.1984); ("a lessor ... may refuse consent to an assignment or sublease only when the lessor has a good faith reasonable objection to it"); *Boss Barbara, Inc. v. Newbill*, 97 N.M. 239, 638 P.2d 1084 (1982) (reasonableness standard); *Homa-Goff Interiors, Inc. v. Cowden*, 350 So.2d 1035 (Ala.1977) (same); *Funk v. Funk*, 102 Idaho 521, 633 P.2d 586, 589 (1981) (same); *Fernandez v.*

*Vazquez*, 397 So.2d 1171, 1174 (Fla.Dist.Ct. App.1981) ("[w]here a lessee is entitled to sublet under common law, but has agreed to limit that right by first acquiring the consent of the landlord, we believe the lessee has a right to expect that consent will not be unreasonably withheld"); *Cohen v. Ratinoff*, 147 Cal.App.3d 321, 330, 195 Cal. Rptr. 84 (1983) ("where, as here, the lease provides for assignment or subletting only with the prior consent of the lessor, a lessor may refuse consent only where he has a good faith reasonable objection to the assignment or sublease"); *Schweiso v. Williams*, 150 Cal.App.3d 883, 198 Cal.Rptr. 238 (1984) (same); *Jack Frost Sales, Inc. v. Harris Trust & Savings Bank*, 104 Ill. App.3d 933, 60 Ill.Dec. 703, 433 N.E.2d 941 (1982) (landlord cannot unreasonably withhold consent); *Gamble v. New Orleans Housing Mart, Inc.*, 154 So.2d 625, 627 (La.App.1963), *cert. denied*, 156 So.2d 229 ("the lessor cannot unreasonably, arbitrarily or capriciously withhold his consent"); Note, *NYRPL § 226–b: No Right to Sublease Without Consent*, 9 Fordam Urb.L.J. 753 (1981). Accordingly, it would appear that the debtor/tenant would have a reasonable right to sublet. To hold otherwise would be contrary to the well established principle that equity abhors a forfeiture. *See, e.g., In re Allen A Resort, Inc.*, 38 B.R. 663, 665 (Bankr.D.N.H.1984); *In re KDT Industries, Inc.*, 32 B.R. 852 (Bankr. S.D.N.Y.1983); *In re Bentley*, 26 B.R. 69 (Bankr.D.D.C.1982).

Finally, absent the January 6th agreement, the debtor could have negotiated a "buy-back" arrangement with the landlord/defendants. Through such an agreement, the defendants could recapture the leased premises and lease the premises to another tenant at a higher rent.[4] Of course, one could argue that the January 6th agreement was such a "buy-back." However, comparing the January 6th agreement to a "buy-back" proves why common sense dictates that the debtor received nothing from the January 6th agreement, while the defendants gained a substantial asset—prior to January 6, 1984, the debtor had a 15-year lease at a rental substantially below market rate while, after January 6, the lease could be terminated upon 30-day notice and the landlord could have leased the premises at a substantially higher rate without incurring any obligation to actually do anything. In fact, the landlord did very little, and provided no benefit to the tenant and the landlord need not even consider termination until he felt so inclined or had struck a better deal. There was not even a short release of rent as in *In re Ferris*, 415 F.Supp. 33 (W.D. Okla.1976), where even the forgiveness by the landlord of $6,000 as past due rent was not sufficient reasonably equivalent value to avoid a fraudulent conveyance.[5]

Accordingly, I find that the debtor received less than a reasonably equivalent value in exchange for the January 6th agreement. The January 6th agreement is avoided under 11 U.S.C. § 548 and, therefore, the original lease, as assigned, is in full force and effect.

Judgment for the plaintiff.

---

**4.** Not only could the defendants rent at a higher base rate, but the possibility existed that any tenant would pay rent through a percentage of gross sales clause.

**5.** The defendant has relied upon the case of *In re J.K. Chemicals, Inc.*, 3 C.B.C.2d 520 (Bankr.D. R.I.1981). In that case, unlike the case before me, the trustee offered no evidence to establish the value of what the debtor surrendered in order to determine whether the debtor had received reasonably equivalent value for the purposes of a fraudulent transfer. In the case at bar, however, Fashion Gallery has presented substantial expert testimony establishing the value of the debtor's leasehold interest.