### In re EDWARD HARVEY COMPANY, INC., Debtor.

**Robert FITZGERALD, Trustee In Bankruptcy of Edward Harvey Company, Inc., Plaintiff,**

**v.**

**Carroll L. CHEVERIE, Jr., Trustee of Cheverie & Company (Bankhouse) Limited, A Massachusetts Limited Partnership, Cheverie & Company, a General Partnership, and Carroll L. Cheverie, Jr., Individually and as a General Partner of Cheverie & Company, Defendants.**

**Bankruptcy No. 85–371–L.**
**Adv. No. 85–280.**

United States Bankruptcy Court, D. Massachusetts.

Jan. 9, 1987.

---

**8.** For example, defendant's memorandum of law in support of his motion cites no bankruptcy decisions.

Christopher W. Parker, Craig and Mac-Auley, Boston, Mass., for plaintiff.

Bartholomew P. Molloy, Tyler & Reynolds, Boston, Mass., for defendants.

## MEMORANDUM

JAMES N. GABRIEL, Chief Judge.

The matter before the Court is the complaint, filed, on July 23, 1985, by Robert Fitzgerald, Trustee (the "Trustee") of Edward Harvey Company Inc. (the "Debtor"), against the above named defendants ("the defendants" or "Cheverie"). Through his complaint, the Trustee seeks a determination that the termination of the Debtor's leasehold interest in the ground floor premises of 15 School Street, Boston, Massachusetts, pursuant to a Settlement Agreement dated February 22, 1985 between the Debtor and Cheverie, was a fraudulent conveyance. Specifically, the Trustee asks that the conveyance be set aside pursuant to either section 548[1] of the Bankruptcy Code or M.G.L. c. 109A §§ 1–13 (the Massachusetts Uniform Fraudulent Conveyance Act or the "UFCA")[2] so that the Trustee may sell the Debtor's leasehold interest. Alternatively, the Trustee seeks damages equal to the full value of the years remaining under the lease, including its five year option.

Cheverie filed an untimely answer and counterclaim, on June 24, 1986, in which it seeks a determination that the Trustee has no right to assume or reject the lease and an order requiring the Trustee to surrender and deliver possession of the premises and to pay appropriate use and occupancy charges.

The complaint raises a threshold issue as to whether the termination of the Debtor's leasehold interest was a fraudulent conveyance. It also raises a number of novel issues as to the relationship between sections 548 and 365 of the Bankruptcy Code.

## FACTS

The facts essentially are undisputed. On June 3, 1966, the Debtor entered into a lease with Samuel S. Weinrebe ("Weinrebe"), Trustee of 15 Executive Realty Trust, for approximately 2,500 square feet of ground floor space at 15 School Street. The lease commenced on June 1, 1966 and was for a term of ten years, expiring on May 31, 1976. The Debtor used the premises as a retail luggage and leather goods store. Parenthetically, the Debtor later opened a second luggage store at the Prudential Center.

On May 14, 1976, the lease was extended for an additional ten year term with the following proviso contained in a separate extension agreement:

> Provided the Lessee has not defaulted in any of its obligations hereunder, the Lessee shall have one option to extend the term of this Lease for a period of five (5) years, exercisable by notice from the Lessee to the Lessor, given no later than November 30, 1985.

In 1979, the building containing the leased premises was sold by Weinrebe to Cheverie, and the lease, as amended by the extension agreement, was duly assigned. Under the extension agreement, the annual rent for the premises was $28,500, plus 5% of the Debtor's annual gross sales in excess of $350,000, plus a proportional amount of the real estate taxes on the building. In substance, the tax clause required the Debtor to pay one-sixth of the additional real estate taxes levied by the City of Boston in excess of that levied for the fiscal year ending June 30, 1976. In addition to the so-called tax escalator and percentage rent clauses contained in the extension

1. Section 548 provides in relevant part:
   (a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily- ... (2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
   (B)(i) was insolvent on the date that such transfer was made or such obligation was

incurred, or became insolvent as a result of such transfer or obligation....
11 U.S.C. § 548(a)(2).

2. The Uniform Fraudulent Conveyance Act provides in relevant part:
   Every conveyance made and every obligation incurred by a person who is or will be rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.
   M.G.L. c. 109A, § 4.

agreement, the lease, in an addendum to the standard form, contained the requirement that

The Lessee, within sixty (60) days after the end of each lease year, shall cause a statement of the gross sales of the Lessee made at, in, on and/or from the demised premises for such lease year to be certified by its regular accountant, or any certified public accountant, and a copy of such statement certified by such accountant shall be delivered by the Lessee to the Lessor within such sixty (60) day period.

With respect to the aforementioned lease provisions, the parties have stipulated that for 1980, 1981, 1982, 1983, 1984 and part of 1985, all monthly and percentage rents were paid by the Debtor and received by Cheverie, except for two monthly rental payments which were not paid, pursuant to an agreement of the parties, because of the renovation of the School Street property. The parties also have stipulated that the Debtor furnished Cheverie with uncertified financial statements regarding the Debtor's operations for the years 1980, 1981, and 1982.

The Debtor was unable to furnish certified financial statements to Cheverie because it engaged the services of an accounting firm located in Randolph, Massachusetts, Maltz & Post, Certified Public Accountants, and the Debtor's president and principal stockholder, Harvey Maltz, was the brother of Edward Maltz, a partner in Maltz & Post. Because of their relationship, Maltz & Post was precluded by the rules governing the conduct of certified public accountants from certifying the Debtor's financial statements. When Cheverie became the owner of the property and the assignee of the lease, it was apprised of the fraternal relationship between Harvey and Edward Maltz.

Although the Debtor paid its monthly and percentage rent, it regularly failed to make the monthly payments on or before the first day of each month as required by the lease. On each occasion when the Debtor failed to timely pay its rent, Cheverie, either orally or in writing, notified the Debtor that it was in default of its obligation. Cheverie also demanded certified financial statements attesting to the Debtor's gross sales. By letter dated November 2, 1982, Cheverie sent a notice of default to the Debtor, informing the Debtor that it had failed to provide quarterly statements of gross sales and to provide certified financial statements. On September 22, 1983, Cheverie again notified the Debtor that it was in default of its obligations to timely pay percentage rent based on gross sales and to timely pay its share of the tax escalator then in effect. Shortly thereafter, on September 27, 1983, Cheverie notified the Debtor that it was in default of its obligations to provide quarterly statements of gross sales, to provide reports to the Commonwealth of Massachusetts regarding sales taxes and to provide certified financial statements.

In 1984, Cheverie sent two letters to the Debtor, one dated October 16, 1984 and the other dated November 6, 1984, advising the Debtor that it was in default with respect to various lease provisions. Finally, by letter dated December 13, 1984, Cheverie's attorneys informed the Debtor that it had been granted 30 days to quit the premises because of the alleged defaults and that an action for eviction would be initiated in the event the Debtor failed to quit.

The financial condition of the Debtor at that time was tenuous. In early 1984, Harvey Maltz had contracted a terminal disease that affected both his physical and mental abilities. In January of 1985, he was in and out of the hospital on numerous occasions and his condition was deteriorating rapidly. As a consequence, he was delinquent in paying the Debtor's federal and state withholding and sales taxes, and several large checks made payable to Cheverie were returned for insufficient funds.

At the beginning of 1985, the Debtor's obligations included tax delinquencies of approximately $125,000, as well as the balance of $70,000 on a loan the Debtor had obtained from the Liberty Bank and several thousand dollars worth of trade debt. It was at this juncture that Cheverie, on Janu-

ary 22, 1985, filed a summary process action against the Debtor in the Boston Municipal Court seeking entry and money damages. The Debtor sought to remove and consolidate the summary process action with a previous declaratory judgment action it had commenced in the Superior Court. A justice of the Superior Court ordered consolidation of the two cases, granted Cheveries' motion for a speedy trial and set both matters for trial on March 13, 1985.

Confronted with crushing financial liabilities, serious legal problems, and the proximity of Harvey's death, the Debtor's owners, Harvey and Edward Maltz, considered the idea of filing a petition for relief under Chapter 11 of the Bankruptcy Code. However, the brothers rejected the idea because Edward was not interested in operating the business. They opted instead to have the Debtor cease operations, liquidate its inventory and pay as many creditors as possible. In accordance with that decision, Harvey Maltz, on behalf of the Debtor, entered into a Settlement Agreement with Cheverie on February 22, 1985. Under the Settlement Agreement, the Debtor relinquished its leasehold interest and received, at least in Cheverie's view, the following benefits:

1) the lease was terminated by voluntary surrender by the Debtor and acceptance by the defendants;

2) the Debtor was allowed to holdover until March 31, 1985 and conduct a final liquidation, going out of business, or auction sale on the premises;

3) the Debtor was allowed to vacate the premises anytime prior to March 31, 1985 and to pay rent only for such days as it actually used the premises at the rate of $79.17 per day, which amount is equal to the prior monthly rent of $2,375 divided by thirty;

4) the Debtor was released of its obligation to pay rent through May 31, 1986 in the approximate amount of $30,000;

5) the Debtor was allowed to reduce by one-half the amount due Cheverie for percentage rent attributable to sales subsequent to February 20, 1985;

6) the Debtor was allowed to attribute to the School Street premises only 42% of the sales from the liquidation sale of inventory from both the School Street and Prudential Center stores conducted by Apparel Imports, Inc.;

7) the Debtor was allowed to exclude from the determination of percentage rent the proceeds of inventory and equipment disposed of by bulk or auction sale;

8) the Debtor's obligations to pay litigation fees and costs, including the cost of a bond on appeal were terminated by the filing of voluntary stipulations of dismissal of the court actions between the parties;

9) the Debtor was relieved of obligations to render certified financial statements and to pay additional rent determined to be owed as a result of those statements; and

10) the Debtor obtained a release of all claims from Cheverie.

In conjunction with the Settlement Agreement, on or about February 22, 1985, a Notice of Termination of Lease was filed in the Suffolk Registry of Deeds.

Approximately three weeks after the Settlement Agreement was signed, Harvey Maltz died. Shortly thereafter, on March 29, 1985, an involuntary bankruptcy petition was filed against the Debtor. Less than one month later, on April 25, 1985, the order for relief was entered. The Trustee did not move to assume the lease within 60 days of the entry of the order for relief, nor did he move for an extension of time to assume the lease. Likewise, the Trustee gave no notice to Cheverie by November 30, 1985 of an intention to exercise the five year option.

The Trustee filed the instant complaint approximately three months after the entry of the order for relief. A pre-trial hearing was held on October 9, 1985 before Judge Lawless, at which time pending motions to consolidate and to dismiss were continued generally. In May of 1986, the Court per Judge Gabriel, conducted a further pre-trial hearing. At that time, the pending motion to dismiss was withdrawn and the motion to consolidate mooted by the dismissal of a related adversary proceeding.

At the trial, which was conducted on June 25, 1986, the Debtor introduced the testimony of Edward Maltz and Donald Reenstierna, and Cheverie introduced the testimony of Richard Cheverie. Mr. Reenstierna testified as an expert witness. He established that the rent under the lease was vastly under current market rates and that the value of the Debtor's leasehold interest in the School Street premises could be calculated as the present worth of the difference between the contract rent and the market rent for the space. Specifically, he estimated that the market rent, as of March 1, 1985, for the premises was $65 per square foot, for an annual rent of $162,500, and that the total contract rent under the existing lease was a combination of the base rent of $28,500 plus a stabilized average (percentage of gross sales and tax escalator payments) of $12,000 per year, yielding a total annual contract rent under the lease of $40,500. By subtracting the annual contract rent from the annual market rent, multiplying the difference by the years remaining in the lease term from March 1, 1985 through May 31, 1991, and discounting the figure so obtained by 12%, Mr. Reenstierna calculated that the present value of the income difference to be $517,000 for the period March 1, 1985 through May 31, 1991.

## DISCUSSION

Pursuant to section 548 of the Bankruptcy Code, the Trustee has the burden of proving, by a fair preponderance of the evidence, that 1) the Settlement Agreement constituted a transfer of the Debtor's property which occurred on or within one year prior to the filing of the bankruptcy petition; 2) the Debtor was insolvent at the time of the transfer; and 3) the Debtor received less than a reasonably equivalent value in exchange for such transfer. *Cf.* 11 U.S.C. § 548(a)(2); *In re Fashion World, Inc.,* 44 B.R. 754, 756 (Bankr.D. Mass.1984). Parenthetically, the Court only will consider the Trustee's claim under section 548 of the Bankruptcy Code since section 4 of the UFCA is similar but not identical to sections 548(a)(2)(A) and (B)(i) of the Bankruptcy Code.[3] *See generally* 4 L. King, *Collier on Bankruptcy* ¶ 548.01 (15th ed. 1986). The Bankruptcy Code contains definitions of the terms "value", "insolvent" and "transfer." Value "means property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or a relative of the debtor." 11 U.S.C. § 548(a)(2)(A). Insolvent means "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at fair valuation...." 11 U.S.C. § 101(29). Transfer "means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property...." 11 U.S.C. § 101(50).

The Trustee's argument is six-fold. The Trustee asserts that the Settlement Agreement, by which the Debtor's leasehold interest was actually terminated, constituted

---

**3.** One commentator has compared the two provisions as follows:

Section 4 of the UFCA takes a similar, but not identical, approach to section 548(a)(2)(A) and (B)(i) of the Bankruptcy Code. It provides that conveyances made and obligations incurred are fraudulent as to existing creditors when (1) the debtor was insolvent or rendered insolvent by the conveyance or obligation and (2) the debtor failed to receive fair consideration for the conveyance or obligation. Unlike sections 548(a)(2)(A) and (B)(i) of the Bankruptcy Code, UFCA section 4 does not prescribe an objective test to determine the absence of a fraudulent conveyance. Although section 4 states that a conveyance or obligation which meets the above two conditions "is fraudulent as to creditors without

regard to [the debtor's] actual intent," this is not really so. A finding of good faith is a necessary condition for the existence of fair consideration under UFCA section 3.

Carl, *Fraudulent Transfer Attacks on Guaranties in Bankruptcy,* 60 Am.Bankr.L.J. 109, 117 (1986). The UFCA and other state fraudulent transfer laws only are applicable in bankruptcy proceedings pursuant to section 544(b) of the Bankruptcy Code, which provides that "[t]he trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title." 11 U.S.C. § 544(b).

a transfer of the Debtor's interest in property which occurred one year prior to the filing of the involuntary petition. The Trustee relies on *In re Fashion World*, 44 B.R. 754 (Bankr.D.Mass.1984), for the proposition that the termination of a leasehold interest constitutes a transfer. In that case, the court per Judge Lavien, held that a lessor's option to terminate the debtor's lease in return for the lessor's agreement to seek out new tenants for the premises was a transfer for purposes of section 548. *See also In re Queen City Grain, Inc.*, 51 B.R. 722 (Bankr.D.Ohio 1985) (termination of lease between debtor and landlord amounted to "transfer" of an interest in property).

The Trustee next maintains that the Debtor was insolvent on the date of the transfer. The Trustee used the retrojection method for determining insolvency on that date. That method provides that "[w]here a debtor is shown to be insolvent at a date later than the date of the questioned transfer, and it is shown that the debtor's financial condition did not change during the interim period, insolvency at the prior time may be inferred from the actual insolvency at the later date." *In re Arrowhead Gardens, Inc.*, 32 B.R. 296, 301 (Bankr.D.Mass.1983), *aff'd, Briden v. Foley*, 776 F.2d 379 (1st Cir.1985). Through the testimony of Edward Maltz, the Trustee confirmed that the Debtor's Schedules established that the Debtor was insolvent in mid-March of 1985. Maltz then testified that the total value of the Debtor's liabilities exceeded its assets on February 22, 1985, the date of the transfer, by approximately $200,000. Cheverie did not challenge that evidence and introduced no rebuttal testimony or exhibits.

With respect to the third prong of the *Fashion World* test, the Trustee maintains that the Debtor received less than a reasonably equivalent value for releasing the 6½ years remaining on its tenancy under the lease. That argument presumes that Cheverie is estopped from claiming that the Trustee may not exercise the five year option under the lease. The Trustee sets forth several reasons why Cheverie is estopped: 1) because Cheverie waived any defaults under the lease; and 2) because the law abhors a forfeiture. The Trustee also states that he has an absolute right to cure an existing default under 11 U.S.C. § 365(b)(1)(A), but fails to pursue that aspect of his estoppel argument. In support of his waiver argument, the Trustee asserts that Cheverie failed to qualify his acceptance of rent as use and occupation; failed to indicate that he intended to exercise his right of forfeiture, and delayed for an unreasonable time the exercise of his power of termination.

Finally, the Trustee argues that section 365(c)(3),[4] which prohibits the Trustee from assuming a lease that has been terminated under applicable non-bankruptcy law, may not be interpreted so as to preclude the Trustee from assuming the lease at issue here because the lease was terminated in violation of section 548. The Trustee adds that Cheverie is not entitled to an administrative claim for use and occupation because it failed to mitigate its damages by re-letting the property. The Trustee notes that Richard Cheverie testified that he declined to negotiate with the Trustee on two occasions with respect to renting the premises.

Cheverie's responsive argument is fivefold. Cheverie argues that the lease was terminated under applicable state law and, accordingly, is not assumable by the Trustee. Cheverie emphasizes that the voluntary surrender of the lease constituted a valid termination, citing *Guaranty Bank & Trust Co. v. Mid-State Insurance Agency, Inc.*, 383 Mass. 319, 418 N.E.2d 1249 (1981) and *Cassidy v. Welsh*, 319 Mass. 615, 67 N.E.2d 226 (1946).

---

4. Section 365(c)(3) provides in relevant part: (c) The trustee may not assume or assign an executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if- ...

(3) such lease of nonresidential real property has been terminated under applicable non-bankruptcy law prior to the order for relief. 11 U.S.C. § 365(c)(3).

Alternatively, Cheverie argues that the Debtor received "reasonably equivalent value" for its surrender of the lease. That argument presumes that the Trustee is not entitled to exercise the five year option. Cheverie asserts that given the Debtor's numerous defaults under the lease, the condition in the option ("Provided the lessee has not defaulted in any of its obligations hereunder ...") has not been met, and the Trustee, therefore, cannot exercise the option. Consistent with that reasoning, Cheverie maintains that the Trustee cannot assert any claim for damages beyond the leasehold term which ended May 31, 1986.

Additionally, Cheverie argues that the lease must be deemed rejected because the Trustee failed to assume the lease within 60 days after the date of the order for relief. In other words, Cheverie maintains that if the Trustee believed that the lease was assumable, he had a duty to assume the lease or at least a duty to seek an enlargement of time in which to assume or reject the lease. Finally, Cheverie maintains that the Trustee owes it use and occupancy payments as an administrative expense at the rate of $79.17 per day, relying on Richard Cheverie's testimony that the Trustee's counsel requested that he not relet the premises.

The Court finds that the Trustee has unequivocably established that a transfer occurred within one year of the filing of the bankruptcy petition and that the Debtor was insolvent at the time of that transfer. Indeed, Cheverie did not seriously dispute those points either at the trial or in its brief. However, a more serious issue is raised by the requirement that the Trustee establish that the Debtor received less than a reasonably equivalent value in exchange for such transfer.

■ Reasonably equivalent value is determined by review of all the facts and circumstances of the case. *In re Roco Corporation*, 701 F.2d 978, 982 (1st Cir. 1983); *In re Carr*, 40 B.R. 1007, 1008 (Bankr.D.Conn.1984). The issue presents a factual question but, in this case, it also hinges upon resolution of a subsidiary issue: whether the Trustee is precluded from exercising the option by the terms of the lease.

■ The Court finds that the Trustee may exercise the option contained in the lease. As a consequence, the value of the leasehold interest for purposes of assessing the reasonably equivalent value requirement of section 548(a) must reflect the additional five year period available from the option.

The Massachusetts Supreme Judicial Court has indicated that an extension clause should be construed in light of all the circumstances to ascertain the meaning of the language used by the parties, employing established principles of statutory construction. *Talbot v. Rednalloh Co.*, 283 Mass. 225, 230, 186 N.E. 273 (1933). "[I]t is well established that where there is any doubt or uncertainty as to the meaning of the language used in a lease, it should be construed most strongly against the lessor and in favor of the lessee." *In re Bon Ton Restaurant & Pastry Shop, Inc.*, 53 B.R. 789, 795 (Bankr.N.D.Ill.1985). It at least is arguable in this case that the option provision in the lease is ambiguous. It is uncertain whether the parties intended the Debtor to be precluded from exercising the option if it was in default at any time during the term of the lease or whether the parties intended the Debtor to be precluded from exercising the option only if it was not in default on November 30, 1985. Nevertheless, even if the option provision is construed as permitting the exercise of the option only if the Debtor had a record without defaults, Cheverie clearly waived defaults under the lease.

The Supreme Judicial Court has said "[w]here a lessor with knowledge of a lessee's breach of a covenant accepts from him, without reservation, rent accruing thereafter, he thereby waives his right to enforce a forfeiture for that cause." *The Whitehouse Restaurant, Inc. v. Hoffman*, 320 Mass. 183, 186, 68 N.E.2d 686 (1946). Furthermore, that court has stated:

equity does not favor a forfeiture.... 'Relief against forfeiture has been granted although a lessee has failed to pay

rent at the times and in the manner designated by the lease and even if such failure has been wilful [sic] and intentional, or where the lessee has breached a collateral covenant ... and such breach has been due to accident or mistake and no harm has resulted to the lessor, or where, if the lessor was harmed, the damage could be readily ascertained and compensation paid so the lessor would be put in the same position as if no such breach had occurred.

*Howard D. Johnson Company v. Madigan*, 361 Mass. 454, 456–57, 280 N.E.2d 689 (1972).

In the instant case, the Debtor's breaches of lease covenants have not been shown to have harmed Cheverie. For example, although the Debtor consistently failed to supply Cheverie with audited financial statements, the Court notes that there was no allegation that the accounting work done by Edward Maltz was erroneous or in anyway misleading. Furthermore, Cheverie never took advantage of its right under the lease to inspect the Debtor's books and records, thereby permitting the inference that Cheverie did not seriously believe additional percentage rent was due. Likewise, with respect to rental and other payments required under the lease, the Debtor always made the required payments, albeit in a tardy fashion. The most troublesome hurdle for the Trustee to overcome with respect to his waiver argument is the fact that Cheverie informed the Debtor on December 13, 1984 that it had 30 days to quit the premises and shortly thereafter instituted a summary process action. However, the Court finds that the Settlement Agreement by which the lease was voluntarily surrendered superseded the effect of that action.

■ In view of the Court's decision with respect to the Trustee's ability to exercise the option, the Court finds that a determination that the Trustee received less than reasonably equivalent value rests upon a comparison of the value of the lease, including the option, which was valued at $517,000 by Mr. Reensteirna, and the consideration provided in return by Cheverie. Clearly, part of the alleged consideration testified to by Richard Cheverie was valueless. Specifically, Richard Cheverie indicated that the Debtor was relieved of its obligation to provide certified financial statements and to make up any back rent that could be identified as a result of those statements. Since the Court has found that Cheverie waived any right to insist on certified financials, Cheverie cannot rely on the release of that obligation as consideration.

Likewise, the release given by Cheverie to the Debtor relative to the pending summary process action cannot be counted as consideration because the Debtor also gave a release to Cheverie of its claims relative its declaratory judgment suit. Additionally, the release of the Debtor's obligation to pay rent through the end of the lease term (May 31, 1986) did not constitute reasonably equivalent value in view of the fact that the landlord obtained the right to relet the premises for a substantially higher rent, *see In re Fashion World, Inc.*, 44 B.R. 754 (Bankr.D.Mass.1984). With respect to the other elements of consideration cited by Cheverie, the Court finds that their value, even viewed in a light most favorable to Cheverie, in no way approaches $517,000. As a consequence, the Court finds, based on the facts and circumstances of the case, that the Trustee has met his burden of proof with respect to all the requirements of section 548.

■ Turning to the issues raised by section 365 of the Bankruptcy Code, the Court finds that section 365(c)(3) is simply not applicable where, as here, the lease was terminated in a constructively fraudulent manner. As the court in *In re Ted Liu's Szechuan Garden, Inc.*, 55 B.R. 8 (Bankr. D.D.C.1985), determined, the 1984 amendments to section 365(c)(3) of the Bankruptcy Code are merely declarative of existing law and "terminated" with respect to a lease means "finally and irredeemably terminated." *Cf. In re D.C. Diamond Head, Inc.*, 51 B.R. 309, 315 n. 5 (Bankr.D.D.C. 1985). Clearly, the lease in question cannot be said to be finally and irredeemably terminated because this Court has the power

to permit the Trustee to avoid the transfer and to order the reinstatement of the lease. Such power is entirely consistent with the broad powers equity courts have to redress fraud, *In re Ranch House of Orange-Brevard, Inc.*, 773 F.2d 1166, 1169 (11th Cir. 1985), as well as with the rationale for the avoidance of pre-petition transfers under section 548—the preservation of assets of the estate. *In re Butcher*, 58 B.R. 128, 130 (Bankr.E.D.Tenn.1986).

Additionally, the Court observes that the fact that the Trustee may avoid the transfer terminating the lease distinguishes this case from ones such as *In re Crabb*, 48 B.R. 165 (Bankr.D.Mass.1985). In that case, the court, upon motion of the Chapter 11 debtors to assume a lease, determined that where the debtor's assumable interest in the lease expired pursuant to the terms of the lease prior to the exercise of an option to extend the lease, there was no lease to assume and the automatic stay provisions of the Bankruptcy Code had no effect on the running of the debtor's option. Cheverie's argument that the Trustee may not assume and assign the lease because it was validly terminated under state law misperceives the purpose of section 365(c)(3). As the Trustee correctly notes, Cheverie's argument is specious because the lease was not terminated in accordance with state law but rather was terminated in violation of section 548(a) of the Bankruptcy Code. As a consequence, the lease termination is voidable.

█ Having determined that the Trustee may avoid the February 22, 1985 Settlement Agreement, the Court finds that an order reinstating the lease should issue. This decision, however, does not resolve all outstanding issues. There remain questions relative to the applicability of section 365(d)(4).

Section 365(d)(4) provides that

... if the trustee does not assume or reject an unexpired lease of nonresidential real property under which the debtor is the lessee within 60 days after the date of the order for relief, or within such time as the court for cause, within such

60–day period fixes, then such lease is deemed rejected....

11 U.S.C. 365(d)(4). Cheverie, in arguing that the lease was rejected because the Trustee neither assumed it nor moved for an extension of time within which to assume or reject it, overlooks the fact that the lease indeed was terminated, albeit improperly. At the commencement of the case, there was no lease in existence for the Trustee to assume or reject. While the Court notes that had the Trustee moved to assume the lease or moved for an extension of time in which to decide whether to assume the lease within 60 days from the entry of the order for relief, the issue may have been brought to a head sooner, a ruling that the Trustee was required to bring such a motion in order to preserve the estate's interest in the lease would contravene common sense and impose an impossible burden on the Trustee. In other words, this Court's determination as to whether or not there was a fraudulent conveyance is a precondition to a determination by the Trustee to exercise the right to assume the lease. Thus, the Court finds that the normal running of the 60 day period for exercising the right to assume the lease runs from the date of its reinstatement and that the Trustee, therefore, has 60 days from the entry of the order issued pursuant to this memorandum to move to assume the lease.

█ The Court's decision is similar to the decision of the court in *In re Ted Liu's Szechuan Garden, Inc.*, 55 B.R. 8 (Bankr. D.D.C.1985). In that case, the court held that a Chapter 11 debtor could not exercise its right to assume a lease of nonresidential real property until it had established its right to redeem under the law of the District of Columbia. The 60 day period had not yet run (only 36 days had elapsed) when the court took under advisement the question of whether or not there was an unexpired lease which could be assumed. Since the right to assume could not be exercised until the right to redeem was established, the court tolled the running of the 60 day period and granted the debtor the remaining 24 days of the 60 day period

after entry of its opinion. In so doing, the court stated:

> 'The broad rule is laid down that whenever some paramount authority prevents a person from exercising his legal remedy, the time during which he is thus prevented is not to be counted against him in determining whether the statute of limitations has barred his right even though the statute makes no specific exception in his favor in such cases.'

*Id.* at 11. With this quotation in mind, the Court is compelled to observe that it must bear partial responsibility for the outcome in this case which admittedly may seem incomprehensible to Cheverie. This adversary proceeding was filed just four months after the filing of the bankruptcy petition and prior to both the time for exercising the option (November 30, 1985) and the time that the lease expired assuming the option was not exercised (May 31, 1986). Unfortunately, the case was not even tried until June of 1986. Thus, not only must the 60 day period specified by section 365(d)(4) be applied from the reinstatement of the lease, but the running of the option period must be tolled.

The Court directs that the Trustee has 60 days from the date hereof to assume or reject the lease. The Court expects that the Trustee, within that time frame, will endeavor to find a buyer for the lease. Consequently, the Court hereby directs the Trustee to commence current monthly payments under the lease, effective January 1, 1987 and, upon assumption and assignment of the lease, to comply with the requirement of 11 U.S.C. § 365(b)(1)(C) with respect to providing assurance of future performance by the buyer of the lease. In view of Richard Cheverie's contradictory testimony and in the absence of conclusive rebuttal testimony with respect to the post-petition rental of the Debtor's School Street premises, as well as in the interest of fairness, the Court directs the Trustee to compensate Cheverie, from the proceeds of the sale of the lease, for use and occupancy due between February 22, 1985 and January 1, 1987, at the rate of $79.17 per day.

## ORDER

In accordance with the Memorandum entered on January 8, 1987, the Court finds that the termination of the Debtor's leasehold interest is void as a fraudulent conveyance and hereby reinstates the lease. The Trustee has 60 days from the date hereof to assume or reject the lease pursuant to 11 U.S.C. § 365(d)(4). The Trustee is hereby ordered to commence monthly rental payments under the terms of the lease effective January 1, 1987. Upon assumption of the lease and its assignment to a purchaser pursuant to 11 U.S.C. § 365(b)(1)(C), the Trustee is ordered to compensate Cheverie from the proceeds of the sale of the lease, for use and occupancy due between February 22, 1985 and January 1, 1987 at the rate of $79.17 per day. The Court enters judgment for the Trustee on Cheverie's counterclaim except to the extent that the Trustee is to compensate Cheverie for use and occupation.