**In re John Kenyon TURNER and Bonnie Lou Turner, f/d/b/a Tortilla Mfg. & Supply Co., d/b/a Turner Companies, Debtors.**

**Bankruptcy No. 91–00819–BA.**

United States Bankruptcy Court,
D. Wyoming.

Oct. 6, 1992.

Georg Jensen, Cheyenne, WY, for plaintiff.

Justin L. Garrett II, Trial Atty., Tax Div., U.S. Dept. of Justice, Washington, D.C., Donald R. Wrobetz, Asst. U.S. Atty., Cheyenne, WY, for the U.S.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HAROLD L. MAI, Chief Judge.

THIS MATTER came before the court on July 9, 1992, for hearing on the debtor's Objection to the IRS Proof of Claim, both parties being represented by counsel and the debtors appearing personally.

The court having considered the Proof of Claim, the Amendment thereto, the debtors' Objection to the Proof of Claim, the testimony and exhibits, all papers and pleadings herein, having heard argument of counsel, and being fully advised, does hereby find and conclude as follows:

### FINDINGS OF FACT

1. John Kenyon Turner has a high school education. He was in the military for three (3) years, and then went to work in the food service industry. He worked at various jobs in this industry, including work at a McDonald's. He owned and operated a "drive-in" called the Drift–Inn for several years. He also worked in a couple of restaurants located in Laramie, Wyoming.

2. In 1968, Mr. Turner opened a business called "Taco House" located on Lincolnway in Cheyenne, Wyoming. In 1969 he asked Mr. Woodson and Mr. Holmes, two Cheyenne entrepreneurs, to join him in the business.

3. The reason that Mr. Turner asked them to join the business was to obtain their business expertise and capital. Mr. Turner acknowledged that he did not have the necessary experience, education, skills, or money to develop the business to its full potential.

4. Eventually, the name of the business was changed to Taco John's. Mr. Turner did not develop the new name, it was suggested by an advertising agency. The Taco John's business was started at a very opportune time. Due to a good product, good timing, and the business acumen of

Woodson–Holmes, the Taco John's business became a very successful franchise operation. Mr. Woodson and Mr. Holmes formed a corporation, Woodson–Holmes Enterprises, Inc., to engage in the business eventually named Taco John's.

5. The Turners also created business entities to engage in their part of the Taco John's business. These entities included Tortilla Mfg. & Supply Co., Inc., Turner & Turner, and Taco John's Foods, Inc.

6. The Turners and Woodson–Holmes divided the business as follows: Woodson–Holmes operated the franchises. The Turners, through a partnership, operated a corporation called Tortilla Mfg. & Supply Co., Inc. This corporation produced the supplies used by the franchises. There was also a contract involving payments for the use of seasoning recipes developed by Mr. Turner.

7. Bonnie Lou Turner is the wife of John Turner. She is a high school graduate. After high school, she worked briefly at a hospital as a telephone operator. She then married Mr. Turner and worked in his various business operations. She worked at the Drift-Inn. She was a car hop at the Taco House. After Woodson–Holmes joined the business, she worked in the business as general office help or boxing up supplies to be delivered to the franchises. Mrs. Turner never participated in the management of the Taco John's corporation, except for attending annual conventions. She has no business management education, training, experience, or inclination. Mrs. Turner was not involved in the development of recipes or products used in the taco business.

8. Although the business prospered, the business relationship between the Turners and Woodson–Holmes was not smooth. Eventually, in 1972, Mr. Turner filed suit against Woodson–Holmes. As a result of the suit, judgment was entered generally in favor of the Turners.

9. After resolution of the 1972 suit, Mr. Woodson and Mr. Holmes decided that Mr. Turner was hindering the business. Also they felt they had unnecessary problems with franchisors as a result of the actions of Mr. Turner and/or his son. By this time, one of Mr. Turner's sons was running Tortilla Mfg. & Supply Co., Inc. Problems with supplies became so serious that Woodson–Holmes demanded that a joint employee oversee supplies. Woodson–Holmes and the Turner entities each paid a portion of this joint employee's salary. As a result of the restructuring of the supply operation, Woodson–Holmes moved the supply operation to their location. Thereafter, very little supply information was sent to the Turner-controlled portion of the operation.

10. About this time, Mr. and Mrs. Turner began living on a ranch in Colorado with their three (3) younger children. Mr. Turner would only come up to check on the business every week or two (2). When he came up, he would regularly meet for coffee with Mr. Woodson and Mr. Holmes.

11. In 1979 and 1980, a dispute arose between Woodson–Holmes and the Turners involving payments for seasonings royalties and supply and franchise matters. Woodson–Holmes believed they had a good basis to sue the Turners and actually prepared a complaint. This complaint and their demands were delivered to the Turners. Woodson–Holmes' threats of suit against the Turners continued into 1981.

12. The Turners, in response, sent back their own list of demands and letter from counsel. It appears that any counter threats to sue by the Turners was, as Mr. Turner testified, "just smoke." The Turners never intended to sue Woodson–Holmes on these matters.

13. Woodson–Holmes most likely believed the value of their claims against the Turners and the Turner-controlled entities exceeded the value of the Turners' claims against them.

14. For about a year and a half to two years, Mr. Turner, Mr. Woodson, and Mr. Holmes investigated the possibility of merger as a method of solving their business difficulties. However, the attempt was unfruitful because Mr. Woodson and Mr. Holmes decided that they were not interested in remaining in business with Mr. Turner and his family. Similarly, Mr.

Turner was not interested in joining Woodson–Holmes in their expansion plans.

15. Instead, the parties began to discuss a buy out of the Turners' interest. This was seriously pursued because Woodson–Holmes wanted the Turners "out of their hair," and Mr. Turner wanted to be finished with the continual disputes over the business.

16. Mr. Woodson testified that from the Woodson–Holmes' viewpoint, the Turners had nothing really to sell—they viewed any sale price as the cost of removing the Turners from their business. In other words, as the cost of dissolving the business association with the Turners.

17. Mr. Turner, Mr. Woodson, and Mr. Holmes met informally and agreed to a price for the buy out of all the Turner-controlled interests. They mutually agreed on a price of approximately $3,000,000. An allocation of value to assets was not part of the consideration originally agreed to by Mr. Turner, Mr. Holmes, and Mr. Woodson.

18. After the price was agreed, the parties referred the matter to their respective lawyers and accountants to formalize the agreement. There were several proposals and drafts circulated between the parties in their efforts to consummate the sale. As part of these efforts, the Buyers tried to insert an allocation of the price to various components. The Sellers' counsel rejected any such attempt at allocation. As a result, an allocation was *not* included in the actual written contracts.

19. The Sellers' accountant, Joseph J. Paiz, had researched the issue of "strong proof" being required to overcome any allocation of value to a noncompete covenant or to a release of liabilities. Mr. Paiz reviewed the Purchase and Sale Agreement on behalf of the Sellers, and it was his understanding that there was no agreement to an allocation nor any allocation made in the Agreement for Purchase and Sale.

20. On May 14, 1985, Woodson–Homes Enterprises, Inc., Taco John's International, Inc., and Taco John's Seasons, Limited Partnership purchased certain assets of the Turner-controlled entities for a total agreed sale price of $3,525,000 [1] in an arms length transaction documented within the Purchase and Sale Agreement of that date. The actual Sellers were the entities owned and controlled by the Turners and their children—Tortilla Mfg. & Supply Co., Inc., Taco John's Foods, Inc., and Turner & Turner. Hereafter they will be referred to as the "Sellers."

21. Concurrently with the Sale Contract, the parties entered into a "Consulting and Noncompete Agreement." No noncompetition agreement pre-existed the sale. The Consulting and Noncompete Agreement arose simultaneously with the closing of the sale according to the terms of the Purchase and Sale Agreement. Part of this Agreement provided for a "consulting contract" between the Buyers and the Turners. Despite the existence of the Consulting Agreement, neither of the Turners has ever been consulted on business matters by Mr. Holmes, Mr. Woodson, or the entities they control.

22. The Buyers had also sought to have the Turners' adult children agree to a covenant not to compete. Both Mr. Turner and his adult children declined to accept this as a condition. The Buyers did not insist, and the Turners' children are not parties to the Noncompete Agreement.

23. The Purchase and Sale Agreement between Buyers and Sellers does not itself allocate any value to the Consulting and Noncompete Agreement. Further, it provides:

"Section 5. *Summary and payment of purchase price.*

D. Nothing in this Agreement is intended to provide an allocation of the amounts paid and payable hereunder among the assets, services and releases being transferred hereunder, including the listing of the makers of notes and recipients of assets, nor to indicate any agreement between Buyers and Sellers of any such allocation."

---

1. The original price of $3,000,00 was adjusted based upon certain interest bearing payments.

24. The Turners failed to file their tax returns timely. Similarly, the returns of the entities which were controlled by the Turners were not filed on a timely basis.

25. When the Sellers did finally file their tax returns, they reported on their respective tax returns the sale proceeds as representing payments received in exchange for the sale of capital assets including trademarks, trade secrets, and secret recipes, franchise and distribution rights.

26. The Sellers also reported the proceeds as capital gain to the extent the sale proceeds exceeded the basis in the assets, with the exception of Tortilla Mfg. & Supply Co., Inc. (TMS). TMS had entered into a plan of liquidation under § 337 of the Internal Revenue Code of 1957, and no gain was reported by it. Gain was reported by the shareholders of TMS to the extent the fair market value of the assets of TMS exceeded the basis of the shareholders in their shares.

27. The Buyers under the May 14, 1985 Purchase Contract were the entities controlled by Mr. Woodson and Mr. Holmes. They are Woodson–Holmes Enterprises, Inc., Taco John's International, Inc., and Taco John's Seasonings, Limited Partnership. These will be collectively referred to as "Buyers."

28. On their respective tax returns, the Buyers claimed $1,275,000 as an ordinary business expenditure made in exchange for the covenant of John and Bonnie Turner, and the entities they controlled, not to compete. Buyers deducted it as an ordinary deduction on its 1985, 1986, 1987, 1988, and 1989 tax returns. The Buyers also claimed $1,250,000 as an ordinary business expenditure made in consideration of the Sellers' Release of Buyers from liability, and similarly deducted it as an ordinary deduction.

29. The IRS eventually audited the Sellers' tax returns. The IRS, in an audit examination report, allocated $1,275,000 to the Consulting and Noncompete Agreement referred as Exhibit "C" in the May 14, 1985 Purchase and Sale Agreement, and allocated $1,250,000 to the Mutual Release and Indemnification Agreement. The IRS later filed a Proof of Claim in this case reflecting this allocation.

30. Earlier, the IRS had examined the Buyers' tax returns. The IRS took the position that the $1,275,000 of deductions taken as ordinary deductions from income by Buyers for payments upon the noncompete covenant should be disallowed. The IRS did not challenge the $1,250,000 deduction by Buyers as payment for a release from liability for the reason that the statute of limitations had closed as to the years in which deductions were taken by the time the Buyers' tax reporting of this item came to the attention of IRS examiners.

31. The IRS subsequently disallowed the claims of both the Buyers and the Sellers in regard to the $1,275,000. This tactic, commonly referred to as a "whipsaw," protects the interest of the United States in this type of tax controversy.

32. The debtors did not intend to allocate $1,275,000 to the Consulting and Noncompete Agreement.

33. Mr. Turner did not intend to compete with the international Mexican fast food franchise business of the Buyers. He was tired of continual disagreements with Woodson–Holmes. He had no inclination to compete. At the time of the buy out, he was living full time with his family on a ranch in western Colorado. He devoted only "moments a week" to the business.

34. Just as Mr. Turner did not have the skill or expertise to develop a successful company before he invited Woodson–Holmes to join him in 1969, he still did not have the necessary skill and expertise afterwards. The continual quality problems of the Tortilla Manufacturing Company and the supply side of the business are evidence of his lack of business skills and acumen.

35. Mrs. Turner had no involvement in the negotiations for the sale of their interests in Taco John's or Tortilla Mfg. & Supply Co., Inc. In May of 1985, Mrs. Turner's health was poor. She had high blood pressure and was a borderline diabetic. Her doctor advised her to limit stress in her life and to rest. At this time, she and her family were living on a ranch in Colorado.

Her three (3) youngest children were still in school in Colorado.

36. At the time of the sale negotiations and sale, Mrs. Turner had no intention of filing suit on her own behalf or that of the Turner-controlled partnership or corporation against Woodson–Holmes. Mrs. Turner does not believe there was any basis for such a suit.

37. Mr. Turner and Mrs. Turner, the controlling principals of all selling entities, intended to purchase a franchise from Woodson–Holmes, rather than compete with it as a franchisor.

38. The Turners had no meaningful ability to compete with the Buyers such that any allocation of value to the Consulting and Noncompete Agreement would be warranted. The Turners were never involved in the franchise end of the business. As noted before, they had no education, or experience, which would enable them to successfully enter the franchise business.

39. None of the employees involved in franchising operations, nor the joint employees maintained by Tortilla Mfg. & Supply Co., Inc., and Woodson–Holmes for supply operations, maintained any loyalty to Mr. or Mrs. Turner. In fact, the franchisees and distributors for the Taco John's fast-food enterprise were more loyal to Woodson–Holmes than to any of the Sellers. The franchisees were actually hostile to Mr. Turner due to his past actions involving raising fees paid by the franchisees for necessary items.

40. Douglas B. Reeves, a qualified and independent valuation expert, established by his testimony that in valuing the Sellers' assets in 1985 based upon earning capacity, a sale price of between $4,726,000 and $8,000,000 would have been fully justified. The actual sale price of $3,525,000 undervalued the intangible assets of trademarks, trade secrets, and secret recipes of the Sellers, and left no residual value which could properly be allocated to the Consulting and Noncompete Agreement.

41. Mr. Reeves testified as a qualified expert that the Consulting and Noncompete Agreement had no value. This opinion of value was uncontroverted by other expert testimony.

42. The Buyers' behavior indicated they assigned no value to the Consulting and Noncompete Agreement. They failed to enforce the noncompete agreement in view of the current and ongoing competition by Mr. and Mrs. Turner, who are currently involved in a Mexican food restaurant. They failed to call upon the Turners for any consulting services, although having ample opportunity and ability to do so.

43. Since the buy out of the Turners' interests, the value of the Woodson–Holmes controlled entities have increased substantially. This increase in value has occurred totally without any "consulting" or involvement from the Turners. The Turners, on the other hand, have been totally unsuccessful in their subsequent business efforts.

44. The Consulting and Noncompete Agreement had, and has, no value to Buyers and no value should be allocated to it by Sellers for tax reporting purposes.

45. The debtors did not intend to allocate $1,250,000 to the Mutual Release and Indemnification Agreement. Nor should any value be allocated to the same.

46. The Purchase and Sale Agreement itself does not establish a value allocation for the Mutual Release and Indemnification Agreement. According to the testimony of the Sellers' accountant, the Purchase and Sale Agreement did not intend to allocate value to the Mutual Release and Indemnification Agreement. The testimony on behalf of the Buyers could not identify serious claims by the Turner entities against the Woodson–Holmes entities.

47. Mr. Reeves personally interviewed all of the attorneys involved in the mutual threats of suit and inspected all of the documents. He opined that if there were any value to the Release, it was received by the Turners because the Woodson–Holmes claims against them were more valuable than their claims against Woodson–Holmes.

48. Based upon all of the evidence, debtors have clearly established that no

value should be assigned to the Consulting and Noncompete Agreement or to the Mutual Release and Indemnification for tax reporting purposes, and the claim of the IRS should be disallowed to the extent it is based upon a contrary determination.

49. On September 13, 1991, John and Bonnie Turner filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The IRS has filed a claim and filed an amendment to that claim.

## CONCLUSIONS OF LAW

This court has jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157 and 11 U.S.C. § 505. The debtors' Objection to the IRS Proof of Claim is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(B).

During the trial, the parties advised the court that only one (1) issue remained in dispute. That issue is whether the Turners are entitled to treat the entire amount of proceeds they received during 1985–1989, from a contract for the sale of their interest in a business, as capital gains, or whether part of the income must be treated as ordinary income.

■ The Proof of Claim presented by the IRS enjoys presumption of correctness which can be overcome by a preponderance of the evidence favoring the debtors. *Better Beverages, Inc., v. U.S.*, 619 F.2d 424, 428 (5th Cir.1980).

None of the proceeds of the May 14, 1985 sale by Tortilla Mfg. & Supply Co., Inc., Taco John's Foods, Inc., and Turner and Turner to Woodson–Holmes Enterprises, Inc., Taco John's International, Inc., and Taco John's Seasonings, Limited Partnership, should be allocated as a value of the Consulting and Noncompete Agreement.

None of the proceeds of the May 14, 1985 sale should be allocated as a value of the mutual release of liability between Sellers and Buyers.

As the owners of trade secrets following the sale, Buyers would be able to require all franchisees to make use of their trade secret recipe items and to license suppliers for that purpose, *Susser v. Carvel Corporation*, 332 F.2d 505 (2nd Cir.1964). Buy-

ers could prevent competition by Sellers in the supply of the trade secret items in the absence of a noncompete agreement.

■ Amounts paid for a covenant not to compete are ordinary income to the covenantor and may be amortized over the life of the covenant by the purchasers, *Hamlin's Trust v. Commission*, 209 F.2d 761 (10th Cir.1954).

■ A party challenging any allocation contained in a purchase and sale contract may succeed only by producing "strong proof" that the asserted allocation better reflects the actual intent of the parties and the economic realities of the situation. *Major v. Commission*, 76 T.C. 239, 247 (1981), *accord Golsen v. Commission*, 445 F.2d 985 (10th Cir.1971), *cert. denied* 404 U.S. 940, 92 S.Ct. 284, 30 L.Ed.2d 254 (6th Cir. 1987).

■ However, when, as in the present case, there is no agreement between a buyer and seller to allocate any part of a purchase price to a noncompete covenant, the seller may treat all proceeds as capital gain. *James A. Patterson*, V.C.I.R., 810 F.2d 562 (6th Cir.1987).

■ Failure by a taxpayer to file a timely return may be excused upon reasonable cause, which may be demonstrated by good-faith reliance upon the advice of others only in those cases where a taxpayer does not know that a tax return is required. Taxpayers have failed to establish reasonable cause sufficient to avoid imposition of negligence penalties under § 6651 of the Internal Revenue Code.

■ Sellers have established by strong proof that all amounts received by Sellers in connection with the sale may be treated as capital gain to the extent in excess of basis, and the Proof of Claim of the IRS should be, and it hereby is, disallowed and the Objection thereto sustained to the extent inconsistent herewith.

The IRS will be directed to file, as soon as is practicable, a new proof of claim deleting the disallowed amounts.

**996**

The court will enter an appropriate order.