In re WORCESTER QUALITY
FOODS, INC., Debtor.

David M. NICKLESS, Trustee, Plaintiff,

v.

Sheldon GOLUB, Howard Golub, Mitchell
Golub, Phyllis Golub, Golda Golub,
PGA Marketing, Ltd. WQF Holding
Corp., and Larry and Luisa's Fruit
Corp., Defendants.

Bankruptcy No. 90–42013–JFQ.
Adv. No. 92–4018.

United States Bankruptcy Court,
D. Massachusetts.

Feb. 22, 1993.

As Amended March 29, 1993.

David M. Nickless, Nickless & Phillips, Fitchburg, MA, trustee.

Seymour Weinstein, Weinstein, Bernstein & Burwick, Worcester, MA, for defendants.

## OPINION

JAMES F. QUEENAN, Jr., Chief Judge.

This is a complaint brought by the chapter 7 trustee, David M. Nickless (the "Trustee"), against controlling shareholders, directors and officers of Worcester Quality Foods, Inc. (the "Debtor"). Relatives and affiliates are also joined as defendants. The Trustee charges the defendants with various forms of corporate looting. The charges are well founded. Trial has revealed a sorry saga of greed and incompetence. The result is destruction of a company, loss of many jobs and nonpayment of much debt.

### I. GENERAL BACKGROUND

Sheldon Golub and Howard Golub (the "Golubs") are brothers who operated a wholesale plumbing supply business in New York City for a number of years. After selling the business in 1982, they invested in real estate and engaged in the export and import of plumbing supplies. In the spring of 1988, the Golubs learned that the Debtor was for sale through M.R. Eason & Company, Ltd., a business broker. The Debtor was a distributor to a number of fast food chains located throughout New

England. Among its many customers were numerous franchised locations of Wendy's, Burger King, and Kentucky Fried Chicken. The Golubs had no experience whatsoever in this type of business. They nevertheless pursued the purchase.

The Debtor's outstanding voting shares then consisted of 100 shares of voting common stock. F.H. Food Service Corporation ("Farm House") owned eighty of these shares. Alan Fox and Bruce Fox owned ten voting shares each. In late 1988, the Debtor issued 803,625 shares of nonvoting common stock to Bernard Stone ("Stone"), the Debtor's founder and former president. These shares had their origin in a deferred compensation obligation incurred by the Debtor several years before in connection with purchase of the Debtor by Farm House. The Debtor had defaulted under Stone's deferred compensation agreement. The 803,625 shares issued to Stone were in consideration of discharge of the Debtor's deferred compensation obligation to him.

Negotiations led to the execution on November 4, 1988 of a stock purchase agreement among Golub Enterprises, Inc. ("Enterprises"), Farm House, Alan Fox and Richard Fox. The Fox family had been involved with Stone in the ownership and management of the Debtor for many years. The Golubs owned all the stock of Enterprises. They organized it for the express and sole purpose of taking title to the Debtor's stock. The purchase price under the November 4th agreement was $500,000 in cash, with $400,000 to be paid to Farm House and $100,000 to the two Foxes. The agreement closed on January 12, 1989. Enterprises paid the cash price to the sellers then or shortly thereafter.

The Golubs needed Stone's help in the venture. At the January 12th closing they caused two agreements to be entered into with Stone. Under one, Enterprises purchased Stone's 803,625 nonvoting shares for $8,036.25. Under the other, the Debtor obtained the right to Stone's services through December 31, 1990 at an annual "salary" of $150,000. Stone was engaged as a "management consultant" to "participate in giving advice to and for the general

and active management of the business." In the same agreement the Debtor committed itself to pay Stone $795,589 in consideration of Stone's agreement not to compete with the Debtor for a period of three years. This amount, when added to the $8,036.25 stock price, represented the amount which the Debtor had previously owed Stone under the ownership of Farm House. The $795,589 was payable in twenty monthly installments of $10,000 each commencing April 30, 1989 and a lump sum payment of $595,589 due on December 31, 1990. The stock which Stone sold under the other agreement was to be held in escrow until all these payments were made.

In late 1990, the Debtor, Enterprises and Stone entered into an agreement dated "as of" January 12, 1989. Under it the consulting portion of their original agreement remained an agreement between the Debtor and Stone, but the noncompetition portion became an agreement between Enterprises and Stone. By then Enterprises had paid Stone $234,000. At some time it became the intention of the parties that Enterprises be the obligor and beneficiary of Stone's noncompetition agreement. The 1990 amendment memorialized that intention. One can only speculate on the purpose of these machinations.

Immediately after the purchase, the officers and directors of the Debtor were as follows:

| | |
|---|---|
| President | Michael Donovan |
| Vice President | William Ballou |
| Treasurer | Sheldon Golub |
| Clerk | Howard Golub |
| Directors | Michael Donovan |
| | William Ballou |
| | Sheldon Golub |
| | Howard Golub |
| | Mitchell Golub |

Mitchell Golub is the son of Sheldon Golub. He worked for the Debtor in a minor capacity. In June of 1989, Stone took Donovan's place as president and Mitchell Golub's place as director.

The Debtor had been losing money prior to the sale. Its losses continued thereafter. It lost $527,351 in its fiscal year ending April 1, 1989 and $886,621 in its fiscal year ending March 31, 1990. The Golubs'

lack of knowledge of the business deprived them of any ability to turn the Debtor's losses into profits. And they had no business plan, only an unrealistic hope of reducing expenses while at the same time enriching themselves.

The Debtor is incorporated under the laws of the Commonwealth of Massachusetts. It operated from two leased locations in Worcester. Its main warehouse and refrigeration plant were on Millbury Street. It had offices and additional warehousing space on Southbridge Street. Operating from two warehouse locations involved inefficiencies. The Golubs had the vague idea of solving this problem by building or purchasing a new plant in which all operations would be consolidated. After the purchase they looked unsuccessfully for locations in Rhode Island and Connecticut. Their relocation plan was more than vague. It did not take into account the likely costs of such a move in disruption to operations and loss of personnel. Nor did they realize that the Debtor's continuing losses left no time for such a grandiose scheme.

The Golubs also had faint hopes of reducing labor expenses through negotiating new work practices and other concessions with the Debtor's union, a local of the Teamsters. That of course is easier planned than accomplished. The company's collective bargaining was renewed in the summer of 1989 with no concession by the union. Indeed, it carried over wage increases from the previous contract. The Golubs claim to have achieved some savings thereafter from new work practices. They did not.

As set forth above, the Debtor's fortunes declined rather rapidly under the Golubs' ownership. Neither the 1989 nor 1990 loss takes into account a number of questionable receivables, including one for $1.3 million whose collectability is doubtful as the result of the customer's bankruptcy. The Debtor's decline continued during 1990 to a point where it was unable to pay its debts as they matured. On November 15, 1990, three creditors filed a petition in this court requesting relief under chapter 7. With the consent of the Debtor, the court on November 30, 1990 entered an order for relief under chapter 11. The Trustee was appointed a chapter 11 trustee shortly thereafter. In May of 1991, the court converted the case to chapter 7 and the Trustee thereafter served in the capacity of chapter 7 trustee.

## II. ACTIONABLE CONDUCT

The Trustee levels numerous charges against the Golubs and the other defendants. The complaint contains six counts: Count I (Fraudulent Conveyance), Count II (Breach of Contract), Count III (Breach of Fiduciary Duty), Count IV (Conversion), Count V (Breach of Corporate Veil) and Count VI (Preferences). For the most part, however, these counts concern the same transactions.

*Salaries and Fees*

The Golubs enhanced their life styles at the expense of the Debtor's deteriorating financial condition. They placed themselves on the payroll at an annual salary of $156,000 each, payable at the rate of $6,000 every two weeks. They changed this a few months after the purchase so that each received $2,000 as salary every two weeks. The balance of $4,000 was paid as a "consulting fee" to PGA Marketing Co. ("PGA"), a corporation owned by them which had been in the export-import business. From April of 1989 to March of 1990, the Debtor paid $8,000 to PGA every two weeks, a total of $192,000. From March of 1990 to November of 1990 these $8,000 payments were made to Philgo Realty Co. ("Philgo"). Philgo is a company with real estate interests in New York which is beneficially owned by the Golubs despite their claim that their wives own its stock. The $8,000 payments to Philgo totaled $144,000. As a result of those arrangements, the Debtor paid each of the Golubs a salary of $76,000 during calendar 1989 and $65,500 during calendar 1990. (Although the 1990 salary of $65,500 is not twenty-six times $2,000 this is the amount shown on the Golubs' 1990 federal income tax return). Under these various compensation arrangements, therefore, the Debtor

paid the Golubs, PGA and Philgo total compensation of $619,000 of which $283,000 was paid to the Golubs as salary.

Viewing these compensation arrangements in the form in which the Golubs cast them, it is clear that neither PGA nor Philgo performed any services for the Debtor in consideration of the payments. Both were in unrelated businesses.

Nor can it be said that the Golubs each earned $156,000 per year and gifted part of their salaries to PGA and Philgo. There is no indication from their federal income tax returns that they did this. They reported only what they received in salary from the Debtor. The reasonable value of their services, moreover, was not even enough to cover the $2,000 each received every other week from the Debtor during most of this period.

The Golubs continued to reside on Long Island, traveling to Worcester on the plane discussed below. The Debtor's presidents, first Donovan and then Stone, ran its day-to-day operations along with other senior managers. They and not the Golubs understood those operations and knew the Debtor's employees, customers and suppliers. Howard Golub's office of clerk involved no onerous duties. Sheldon Golub was treasurer in name only. He has no financial skills. The financial affairs of the Debtor were run by its controller and chief financial officer, William Ballou. Following Mr. Ballou's departure in the fall of 1989, one Paul Clark assumed those duties.

The Golubs spent some time on company affairs. They made some major decisions and kept in touch with the status of operations. Howard Golub's activities are difficult to categorize. Sheldon Golub was more involved in sales than any other aspect of the Debtor's business. But neither was worth the salary paid him, much less the $156,000 they claim they were each worth.

Indeed, any benefit from Sheldon Golub's sales efforts is more than offset by the foolish loan he had the Debtor make to a new customer. In late winter of 1990, he obtained Consumer Food Services, Inc. ("Consumer") as a customer. The arrangement with Consumer involved loans and credits to Consumer from the Debtor. By March of 1990, the loans and credits had a balance of $450,000. Consumer gave the Debtor a note in that amount bearing interest at ten percent and payable in four equal installments between May 19, 1990 and June 6, 1990. The note was subsequently extended to July 6, 1990. No portion has ever been paid. The Debtor had never made loans to a customer before, and such loans are far from common in the industry. The Golubs made no reasonable investigation of Consumer. At the time of the loan, Consumer was in the process of disposing of its assets and was not in sound financial condition. On September 14, 1990, Consumer filed a petition under chapter 11. On November 25, 1992, it filed a plan of reorganization proposing to pay the Debtor and other unsecured creditors thirteen percent of their claims over five years.

Another problem with Sheldon Golub's sales efforts is that he concentrated upon customers located in New York and New Jersey. The Debtor had previously confined its market area to New England. Servicing customers outside New England was inefficient because of the additional transportation costs involved.

In sum, there was no consideration whatsoever supporting the consulting fees paid to PGA and Philgo even if we consider those fees as having been paid for the services of the Golubs. The services of the Golubs were not worth the salary paid them.

The Golubs were not content with salary and consulting fee payments totaling $619,000. They also caused the Debtor to pay Enterprises "consulting fees" totaling $234,000. The Debtor made these payments for the most part at the rate of $10,000 per month. The Golubs claim that the money was used to pay Stone under his noncompetition agreement, which called for $10,000 monthly payments. If the money was so used, this did no more than satisfy the obligation of Enterprises. Under the amendment to the agreement with Stone, Enterprises assumed all the obligations and

benefits of that agreement as of January 12, 1989.

### Loans

Enterprises owes the Debtor $240,000. The draft financial statement for the fiscal year ending March 31, 1990 indicating this receivable was entered into evidence and confirmed by the senior partner of the accounting firm that prepared it. The debt was uncontested at trial. The 1990 financial statement indicates that $120,000 of this obligation comes from stock transfers at the closing whereby Stone transferred 120,000 of his nonvoting shares to the Debtor and the Debtor sold the shares on credit to Enterprises. This does not make much sense, particularly since the stock sales agreement with Stone indicates he sold all his shares to Enterprises for $8,036.25. Although the precise background of this debt is not important, what apparently happened is that $120,000 of the $500,000 paid by Enterprises for the Debtor's stock came from the Debtor.

A note to the financial statement indicates, and I find, that the other $120,000 of the Enterprises debt is based on advances the Debtor made to Enterprises during the fiscal year ending March 31, 1990.

The sole function of Enterprises was to hold the Debtor's stock. The only way it could pay this debt was from distributions it received from the Debtor on account of its stock ownership. The $240,000 Enterprises receivable is therefore worthless *to the Debtor*, even without considering the worthless nature of the Debtor's stock.

The draft financial statement also indicates, and I so find, that "[t]he Company loaned one of its officers $75,000 on March 31, 1990." The books reflected such a loan. It is thus clear that an officer and not Enterprises owes the debt, despite the Golub's protests to the contrary. Further identification of the obligor will be discussed later.

### Personal Legal Bills

The Trustee also seeks to recover sums paid by the Debtor for legal services rendered to the Golubs and Enterprises in connection with purchase of the Debtor's stock and defense of a suit for a fee brought against them by the broker who introduced them to the Debtor. A New York City attorney named Anthony V. Labozzetta represented Enterprises in the purchase. He performed services in the negotiation and preparation of the purchase agreement and at the closing on January 12, 1989. The Debtor paid his bill addressed to Enterprises in the sum of $50,846. The Debtor also paid a $675.00 separate bill rendered by Mr. Labozzetta for services in preparing the later agreement with Mr. Stone whereby Enterprises received the benefit of his noncompetition agreement. Winich & Rich, P.C., a New York City law firm, reviewed the closing documents and rendered a bill to the Golubs for $511.40, which the Debtor paid.

Attorney Labozzetta also represented the Golubs in the litigation brought against them by the broker, M.R. Eason & Company, Ltd. His legal bills for this litigation, paid by the Debtor, total $21,968.30. Finally, the Debtor paid a bill for $6,500 which attorney Labozzetta rendered to the Debtor dated August 14, 1990 reading "General advice and counseling re: Farm House matter." This bill related to the current rights of Enterprises against Farm House under its prior stock purchase from Farm House.

The Debtor received no benefit whatsoever from these legal services. As the purchaser of the Debtor's stock, Enterprises was the beneficiary of services in connection with that purchase. The defendants in the broker's suit, not the Debtor, benefitted from representation in that litigation. The stock purchase agreement of November 4, 1988, moreover, places the obligation to pay the broker (Robert Lee of M.R. Eason & Company, Ltd.) upon Enterprises.

### Mercedes and Phone Bills

The Golubs caused the Debtor to lease a 1989 Mercedes automobile for each of them under a three year lease at a cost per car of $1,256.75 a month. The Golubs guaranteed payment. By December of 1990 the Debtor's monthly payments on both cars totaled $50,290.00. The Trustee was ap-

pointed as the chapter 11 trustee in that month. At about the time of his appointment, the Golubs caused the Debtor to make prepayments on both cars through to the following summer, at an additional cost of $15,081.00.

The Golubs used these cars almost exclusively for personal purposes. They continued to reside at all times on Long Island. The prepayments, if possible, are worse than the monthly payments. They applied to a period after the Trustee took over management of the Debtor.

The two Mercedes of course came with phones. The Golubs used the phones for personal purposes as well. The Debtor's payments here totaled $16,706.23.

The Debtor also paid $8,617.57 in bills for phones at the Golubs' homes. Unlike the car phone payments and the other expenditures, these payments were business related. The Golubs used their home phones for the most part on the Debtor's business.

*Plane Expenses*

The Debtor leased a plane which was kept in a hanger on Long Island. The pilot was placed on the Debtor's payroll at an annual salary of $50,000 per year. The Debtor paid all the fuel costs and other expenses. The hanger fee payments totaling $18,525.00 were placed into evidence. The Trustee was unable to locate the lease and fuel bills. The Golubs could not remember the amounts paid by the Debtor in rent, fuel and other items. The Golubs used the plane partly to commute from Long Island to Worcester and partly for personal purposes. Because the Golubs' services were not worth the salary paid them, it follows that the Debtor received no benefit from this plane.

*Insurance Payments*

The Debtor paid premiums of $26,326.45 to Guardian Life Insurance Company on insurance policies which were issued on the lives of the Golubs prior to the purchase and owned by PGA. As the owner of the policies, PGA and not the Debtor received the benefit here. The services of the Golubs, moreover, were more than compensated for by their salary payments.

*Other Personal Expenses*

The Trustee introduced evidence indicating the Debtor paid a total of $18,991.02 in expenses incurred by Sheldon Golub and a total of $18,282.09 in expenses incurred by Howard Golub. Having gone over the Debtor's records on those payments, I find that $3,798.00 of Sheldon Golub's expenses were unrelated to the Debtor's business and $7,312.00 of Howard Golub's expenses were unrelated to the Debtor's business.

### III. DUTY OF LOYALTY

■ The obligations imposed upon directors under Massachusetts law are the same as in other jurisdictions. Directors must be loyal to the corporation and not place their interests above those of the corporation. *Spiegel v. Beacon Participations, Inc.,* 297 Mass. 398, 410, 8 N.E.2d 895 (1937); *Baker v. Allen,* 292 Mass. 169, 172, 197 N.E. 521 (1935); *Johnson v. Witkowski,* 30 Mass.App.Ct. 697, 705, 573 N.E.2d 513, 519 (1991). Transactions between directors and their corporation are subject to vigorous scrutiny. "[C]ontracts and transactions between individuals and corporations of which they are directors or officers, which are unfair, in which the individuals have secured an undue or unjust advantage, in which antagonism between the interest of the individuals and the duty of the officers has resulted in the triumph of the former, are voidable at the option of the corporation, its creditors or stockholders." *Winchell v. Plywood Corporation,* 324 Mass. 171, 85 N.E.2d 313, 317 (1949). "[A]nd when any contract or transaction is challenged the burden is on the director not only to prove the good faith of the transaction but also to show its inherent fairness from the view of the corporation and those interested therein." *Id.* *See also Dynan v. Fritz,* 400 Mass. 230, 508 N.E.2d 1371, 1378 (1987) (director met burden of proving fairness of stock repurchase by corporation).

■ The consulting fees, loans and personal expenses detailed above all miserably fail the test of fairness. Except for the Debtor's reimbursement of the few legitimate business expenses, these transac-

tions were fundamentally unfair to the Debtor because it derived no benefit from them whatsoever. The payments are particularly unfair and in violation of the Golubs' duty of loyalty when one considers the Debtor's perilous financial condition. I would find unfairness even if the Trustee had the burden of proof on the issues. The finding is a foregone conclusion in light of the burden imposed upon the Golubs. There were no consulting services performed by PGA, Philgo or Enterprises. Nor, as earlier discussed, can the Golubs legitimize a portion of those fees by the reduction which they took in their salaries. This is not just because they were worth no more than the salaries paid them. They are accountable for the payments in the form in which they cast the transactions.

■ The loans to Enterprises were unfair in three respects. First, the only source for repayment was the Debtor itself in the form of distributions on its stock, the sole asset of Enterprises. The Debtor, in other words, would have to repay itself. Second, that stock was worthless. As later demonstrated, Enterprises was insolvent at the time of the loans. Lastly, the Debtor's financial condition was then so weak that its directors should have been making loans to the Debtor rather than the reverse.

■ The Debtor's $75,000 loan to "one of its officers" requires special consideration. The Golubs seek to avoid personal liability on this loan by contending it was actually made to Enterprises. As noted above, I find otherwise. The Golubs have no more credibility on this issue than they do on others. They did, however, establish a consistent pattern of equality between them. I find that this loan was made to the two of them jointly. It really makes little difference whether the loan was made to the Golubs or to Enterprises. If made to Enterprises, it fails the test of fairness and thus imposes joint and several personal liability upon the Golubs in any event.

## IV. DUTY OF CARE

■ The directors of a corporation owe it a duty of care as well as loyalty. *See Hanson Trust PLC v. ML SCM Acquisi-*

*tion, Inc.,* 781 F.2d 264, 273–77 (2nd Cir. 1986); *Robinson v. Watts Detective Agency,* 685 F.2d 729, 736 (1st Cir.1982); *Production Machine Co. v. Howe,* 327 Mass. 372, 99 N.E.2d 32 (1951). The Trustee alleges in the complaint only that the Golubs breached "their fiduciary duty," without specifying whether it is the duty of loyalty or care, or both. The Trustee in his complaint goes on to describe the Golubs' breaches of their fiduciary duty in these words: "directing that payments be made to parties who performed no service to [the Debtor] or services of little value, by lending money to themselves or parties owned and/or controlled by one or both of them, by paying for personal expenses from assets of the corporation and otherwise by conducting the affairs of [the Debtor] for their best interests and contrary to the best interests of [the Debtor]."

■ The complaint appears to refer only to transactions between the Debtor and the Golubs or their various corporations. It contains no allegations of general mismanagement and makes no reference to specific transactions with third parties such as the $450,000 of loans and credits given to Consumer. Because the Trustee introduced evidence of that transaction, the question arises whether the Trustee should be afforded the opportunity to amend the complaint to include the Consumer transaction. The Trustee, however, has made no such requests. I therefore do not consider the Consumer transaction as a separate cause of action. As previously discussed, it has some relevance to the value of the services of Howard Golub who obtained Consumer as a customer. An amendment may or may not be appropriate in the event of any retrial upon remand or otherwise.

## V. FRAUDULENT TRANSFERS

The complaint alleges in Count I that the various payments made by the Debtor "were made at a time when [the Debtor] was insolvent [and] were made for less than reasonably equivalent consideration or less than fair consideration." The complaint thus alleges a fraudulent transfer cause of action only in reference to insol-

vency and not in reference to unreasonably small capital or actual intent to hinder, delay or defraud creditors.

■■■ The Trustee has the usual burden of proof of a plaintiff here. I conclude that he has met that burden. I find that the Debtor was insolvent at the time of all these payments. Because there was no consideration for them, it follows that they are fraudulent transfers.

I briefly summarize my reasoning in concluding that the Debtor was insolvent. Because the Debtor had been sustaining losses, it is impossible to compute a valuation based upon a multiple of earnings. One must look to the value of the Debtor's assets and compare their total value with the Debtor's total liabilities.

■■■ The Debtor's certified balance sheet of April 1, 1989 shows an excess of assets over liabilities of $1,080,132. Asset values, however, are shown at book value, which for the most part merely reflects historical cost. A different measure of value prevails in determining the issue of insolvency under either section 548 of the Bankruptcy Code or chapter 109A of the Massachusetts General Laws. A debtor is insolvent under these statutes if its total debts exceed its total assets "at a fair valuation" or "present fair salable value." 11 U.S.C. §§ 548 and 101(31) (1988); Mass. Ann.Laws ch. 109A, § 2 (Law. Co-op.1985). The valuation standard is therefore actual value. For present purposes I will assume that this is fair market value and not orderly liquidation value because the debtor was operating as a going concern.

■■■ Application of a fair market value standard requires adjustments to the $19,-916,889 total book value of assets shown on the balance sheet of April 1, 1989. The first and obvious adjustment is a reduction of $108,000 for the worthless receivable from Enterprises. Another adjustment is required for the $1.3 million receivable due from Erin Foods, Inc. which filed a chapter 11 petition in March of 1989. Although there were hopes for a high dividend from this receivable, they were only hopes which have been unrealized. No objective ap-

praisal could value this receivable at more than 50% of its face amount, even as of April 1, 1989. This requires a reduction of $650,000. The asset values on the balance sheet also include about $1,545,025 of improvements which the Debtor made to its leased premises. Those improvements represent costs incurred not assets acquired. The improvements inure to the benefit of the landlord. A further reduction of $1,545,025 is required.

■■■ I turn now to the liability side of the balance sheet. In accordance with generally accepted accounting principles, the April 1, 1989 balance sheet discloses the Debtor's lease commitments in footnotes rather than in its body. But those commitments nonetheless grant legally enforceable rights and cannot be disregarded in determining the question of solvency. Contingent as well as fixed liabilities are taken into account in the determination of insolvency. 11 U.S.C. §§ 101(32), 101(12), 101(5) (1988); Mass.Ann.Laws. ch. 109A, §§ 1, 2 (Law. Co-op.1985). Indeed, the statutes require the full amount of contingent liabilities to be employed, not just the present "value" of the liability. *Id.* The Debtor had substantial lease commitments with respect to its two locations and its equipment consisting largely of trucks. Its rental expenses for real estate and equipment totaled $1,433,644 during its fiscal year ended April 1, 1989. Its commitments on "operating" leases totaled $9,458,613 and its commitment on "capital" leases, exclusive of unearned interest, totaled $364,845. Without going into unnecessary detail on this complex matter, the present value of those lease commitments over the lease values is at least $1.5 million.

■■■ Finally, as noted in the financial statements, the Debtor also had a commitment to Stone on April 1, 1989 which does not appear in the body of the balance sheet. The Debtor was then obligated to pay Stone $795,589 on Stone's covenant not to compete. There was no significant intangible value which could come to the Debtor from this commitment. Stone had previously retired. The chances of him working

for anyone other than the Debtor were slim. The noncompetition agreement, moreover, was one in name only. It was used by both Farm House and Enterprises as a way to pay for Stone's stock and it remained in essence just that. It should be considered a liability for our purposes in its full amount.

■ In summary, the required adjustments to the Debtor's book net worth as of April 1, 1989 are as follows:

| | | |
|---|---|---|
| Book net worth | | $ 1,080,132 |
| Less: | | |
| Enterprises receivable | 108,000 | |
| Erin receivable | 650,000 | |
| Leasehold improvements | 1,545,025 | |
| Lease commitments | 1,500,000 | |
| Stone noncompetition | 795,589 | |
| Total | | 4,598,614 |
| Negative net worth | | $ 3,518,482 |

In other words, the Debtor's liabilities exceeded its assets by $3,518,482 on April 1, 1989. It was therefore insolvent. As a consequence, the Trustee is entitled to recover the payments complained of because the payments were fraudulent transfers. Avoidable transfers may be recovered from either the transferee or the party for whose benefit the transfer was made. 11 U.S.C. § 550 (1988). The Golubs were the real beneficiaries of all these payments. Payments to Enterprises, PGA and Philgo are to be treated as made fifty percent for the benefit of each of the Golubs.

■ At the close of trial, the Trustee requested permission to amend his complaint to conform it to the evidence so as to contain a fraudulent transfer count based upon the Debtor having been left with unreasonably small capital. I took that question under advisement. I conclude that such an amendment should not be allowed. The defendants were understandably prepared only to rebut the allegation of insolvency. They would therefore be prejudiced by such an amendment. The issue may of course be academic in view of my finding of insolvency.

## VI. OTHER THEORIES OF RECOVERY

I summarily deal with the other theories of recovery contained in the complaint. The issues raised in the conversion count are more properly dealt with under the Golubs' duty of loyalty. I see no merit in the count entitled "Breach Corporate Veil." Evidence introduced with respect to piercing the corporate veils of Enterprises, PGA and Philgo falls short of the requirements of that doctrine. *See My Bread Baking Co., v. Cumberland Farms, Inc.*, 353 Mass. 614, 233 N.E.2d 748, 752 (1968). Finally, no evidence was presented establishing any voidable preferences.

I find no ground for imposing liability upon Mitchell Golub, Phyllis Golub or Golda Golub. Default judgment has previously entered against Larry and Luisa's Fruit Corp.

## VII. SUMMARY

In summary, the following sums are due from the various defendants under the theories indicated:

405

|  | Howard Golub | Sheldon Golub | Enterprises | PGA | Philgo |
|---|---|---|---|---|---|
| **(1) Duty of Loyalty:** | | | | | |
| Fees | 853,000.00 | 853,000.00 | .......... | .......... | ———— |
| Loans | 315,000.00 | 315,000.00 | .......... | .......... | ———— |
| Legal bills | 80,500.70 | 80,500.70 | .......... | .......... | ———— |
| Mercedes | 65,371.00 | 65,371.00 | .......... | .......... | ———— |
| Car phones | 16,706.23 | 16,706.23 | .......... | .......... | ———— |
| Plane expenses | 68,525.00 | 68,525.00 | .......... | .......... | ———— |
| Insurance | 26,326.45 | 26,326.45 | .......... | .......... | ———— |
| Misc. expenses | 3,798.00 | 7,312.00 | .......... | .......... | ———— |
|  | $1,429,227.38 | $1,432,741.38 | | | |
| **(2) Contract** | 75,000.00 | 75,000.00 | 240,000.00 | | |
| **(3) Fraud. Trans.** | 716,512.69 | 720,026.69 | 234,000.00 | 192,000.00 | 144,000.00 |
| **(4) Aggregate Liability** | $1,429,227.38 | $1,432,741.38 | $474,000.00 | $192,000.00 | $144,000.00 |

---

(1) The Golubs are jointly and severally liable for all payments made in violation of their duty of loyalty.

(2) The $75,000 loan is treated as having been made to the Golubs jointly.

(3) Payments to Enterprises, PGA and Philgo are treated as having been made 50% for the benefit of each of the Golubs. All other payments are treated in the same fashion except those in reimbursement of individual personal expense.

(4) The Golubs' aggregate liability is limited to the total of the improper payments even though they are liable for those payments on more than one theory.

The foregoing opinion constitutes the court's findings and conclusions and proposed findings and conclusions in this core and related proceeding. Judgments have entered on the fraudulent transfer count.

## JUDGMENT

Upon the Plaintiff's complaint seeking recovery of fraudulent transfers, a trial having been held, it is hereby

ORDERED and ADJUDGED, that the Plaintiff, David M. Nickless, Trustee, shall recover of the Defendant, PGA Marketing Ltd., the sum of $192,000.00 plus post-judgment interest at the rate of 3.45% as provided for by 18 U.S.C. § 1961(a) from the date of this judgment until the debt is paid.

## JUDGMENT

Upon the Plaintiff's complaint seeking recovery of fraudulent transfers, a trial having been held, it is hereby

ORDERED and ADJUDGED, that the Plaintiff, David M. Nickless, Trustee, shall recover of the Defendant, Philgo Realty Co., the sum of $144,000.00 plus post-judgment interest at the rate of 3.45% as provided for by 18 U.S.C. § 1961(a) from the date of this judgment until the debt is paid.

## JUDGMENT

Upon the Plaintiff's complaint seeking recovery of fraudulent transfers, a trial having been held, it is hereby

ORDERED and ADJUDGED, that the Plaintiff, David M. Nickless, Trustee, shall recover of the Defendant, Sheldon Golub, the sum of $720,026.69 plus post-judgment interest at the rate of 3.45% as provided for by 18 U.S.C. § 1961(a) from the date of this judgment until the debt is paid.

## JUDGMENT

Upon the Plaintiff's complaint seeking recovery of fraudulent transfers, a trial having been held, it is hereby

ORDERED and ADJUDGED, that the Plaintiff, David M. Nickless, Trustee, shall recover of the Defendant, Howard Golub, the sum of $716,512.69 plus post-judgment interest at the rate of 3.45% as provided for by 18 U.S.C. § 1961(a) from the date of this judgment until the debt is paid.

## JUDGMENT

Upon the Plaintiff's complaint seeking recovery of fraudulent transfers, a trial having been held, it is hereby

ORDERED and ADJUDGED, that the Plaintiff, David M. Nickless, Trustee, shall recover of the Defendant, Golub Enterprises, Inc., the sum of $234,000.00 plus post-judgment interest at the rate of 3.45% as provided for by 18 U.S.C. § 1961(a) from the date of this judgment until the debt is paid.