In re TRI–STAR TECHNOLOGIES
COMPANY, INCORPORATED,
Debtor.

Tali Tomsic, Chapter 7
Trustee, Plaintiff,

v.

Louis J. Pitocchelli, Defendant.

Bankruptcy No. 98–46124.
Adversary No. 98–4255.

United States Bankruptcy Court,
D. Massachusetts.

March 30, 2001.

■
■
■

Bruce F. Smith, Steven C. Reingold, Jager, Smith & Stetler, Boston, MA, for Tali Tomsic, Chapter 7 Trustee.

Arthur M. Khoury, Mark Ford, Lawrence, MA, for Louis C. Pitocchelli.

## *MEMORANDUM OF DECISION*

HENRY J. BOROFF, Bankruptcy Judge.

Tali Tomsic (the "Trustee"), Chapter 7 Trustee of Tri–Star Technologies Company, Incorporated (the "Debtor") seeks to set aside certain payments made by the Debtor to and on behalf of a former employee, Louis J. Pitocchelli ("Pitocchelli"), pursuant to a consulting agreement. The Trustee argues that those payments constituted fraudulent transfers voidable under 11 U.S.C. § 548(a)(1)(B) and § 544(b). The Trustee also asserts a claim against Pitocchelli for breach of the consulting agreement.

The following constitute this Court's findings of fact and conclusions of law, pursuant to Fed. R. Bankr.P. 7052.

## I. FACTS:

In October of 1992, Michael Downes ("Downes"), Pitocchelli, Anthony Lautieri, Sr., and Robert Perrault resolved to form a printed circuit board manufacturing business. Some or all were or had been employed by Wang Laboratories, Inc. ("Wang"), and they believed they could fashion a profitable enterprise by purchasing Wang's circuit board facility in Methuen, Massachusetts. The investors formed a new company and entered into an initial Memorandum of Understanding, setting forth, inter alia, their respective ownership interests therein and in a real estate trust to be formed to purchase the underlying real estate (the "Real Estate Trust"). Pitocchelli contributed $30,000.00 to the new venture.

The hoped for financing did not materialize. On May 6, 1993, the parties entered into a Settlement Agreement terminating and rescinding the original Memorandum of Understanding. Much (but not all) of Pitocchelli's investment was returned to him. However, a new corporation—now the Debtor—was soon formed. Downes was represented to be the sole principal of the new enterprise, and subsequently, in September of 1993, the financing went through and the Wang facility and Methuen real estate were purchased. Pitocchelli was offered a position in the company as the plant manager. On October 1, 1993, the remaining investors (Perrault had terminated his involvement) entered into a new Memorandum of Understanding (the "1993 Memorandum"). It was agreed that Downes would be the Debtor's President, Treasurer and sole shareholder. Pitocchelli would assume the title of Vice President. Furthermore, a program of "entitlements to a bonus pool, equity appreciation, and other benefits" was established to be distributed in the future according to the various "participation interests" of the parties. Pitocchelli was given an "entitlement" participation of 15% in the Debtor's business and a participation of 16.6% in the Real Estate Trust.[1]

---

1. For further development of the circumstances surrounding the formation of the

In early 1994, Pitocchelli decided to end his involvement with the Debtor. On April 26, 1994, Pitocchelli signed a one paragraph termination agreement (the "Termination Agreement"), releasing and discharging any rights which he might have had under the 1993 Memorandum. Simultaneously, Pitocchelli and Downes, on his own behalf and on behalf of the Debtor, entered into a consulting agreement (the "Consulting Agreement"). Pursuant to the terms of the Consulting Agreement, Pitocchelli agreed to remain "reasonably available" until February 28, 2001 to consult with the Debtor with respect to the general operation of its business. Pitocchelli was not required to go to the Debtor's place of business to conduct that consultation. It was agreed that any and all consultations could be conducted by telephone. Pitocchelli also agreed not to compete with the Debtor's business until February 28, 2001, and to keep its business affairs confidential. And Pitocchelli released any and all claims he might have had against the Debtor and/or Downes.[2] In exchange, the Debtor agreed, inter alia, to pay Pitocchelli an annual consulting fee of $60,000.00 and to maintain his health insurance plan until February 28, 2001. The Debtor also agreed to pay certain life insurance premiums for Pitocchelli until February 28, 1999, and to maintain his automobile lease until it expired by its own terms. In consideration of Pitocchelli's non-competition and confidentiality covenants, the Debtor agreed to pay Pitocchelli an additional $84,000.00 at the rate of $12,000.00 per year. Finally, it was agreed that Pitocchelli would inure to additional benefits if, during a finite period, the Debtor sold its assets, Downes sold his stock interest in the Debtor, or the Debtor issued a public offering of stock.

The Debtor complied with the terms of the Consulting Agreement and made payments of $72,000.00 per year to Pitocchelli ($60,000.00 for the consulting fees and $12,000.00 in consideration for the non-competition and confidentiality covenants) until June of 1997 when payments were reduced on account of the Debtor's mounting financial difficulties. The parties have stipulated that from January 1 through December 31, 1997, the Debtor paid Pitocchelli $57,538.00 directly and $3,854.00 on his behalf for health insurance benefits. From January 1, 1998 to August 14, 1998 (the date of case commencement when all payments stopped), the Debtor paid Pitocchelli $31,023.00 directly and $2,510.00 on his behalf for health insurance benefits. The parties did not stipulate as to the appropriate allocation, if any, of the direct payments made to Pitocchelli in 1997 and 1998, as between the consulting fees and on account of the covenant not to compete.

For his part, it is undisputed that Pitocchelli did not compete with the Debtor's business at any time after execution of the Consulting Agreement. However, Pitocchelli performed few consulting services during the period from April 1994 through mid 1997 and, in fact, no services for the one year preceding the filing of the involuntary Chapter 11 petition filed against the Debtor on August 14, 1998.

The Chapter 11 case was converted to Chapter 7 on November 20, 1998. Before

Debtor and the Real Estate Trust, *see Tomsic v. Lautieri (In re Tri–Star Technologies Co.),* 257 B.R. 629 (Bankr.D.Mass.2001).

**2.** According to Pitocchelli, these potential claims related to Downes' alleged 1992 misrepresentations as to the company's ability to obtain financing, a reduction of Pitocchelli's ownership interests in the Debtor resulting therefrom, as well as unpaid services rendered by Pitocchelli from April 1992 through September 1993 in connection with the Debtor's formation.

conversion, the Debtor filed this adversary proceeding seeking to avoid the payments made by the Debtor to and on behalf of Pitocchelli under the Consulting Agreement as fraudulent transfers under § 548 of the Bankruptcy Code. After conversion, the Trustee was substituted as plaintiff and added additional claims under § 544(b) of the Bankruptcy Code and Mass. Gen. Laws Ann. ch. 109A, § 6(a). The complaint was subsequently amended for a second time, adding a breach of contract claim.

After trial, the matter was taken under advisement. Both the Plaintiff and Defendant have submitted supplemental papers with respect thereto. The Trustee has now limited her avoidance claim under § 544(b) and Mass. Gen. Laws Ann. ch. 109A, § 6(a) to the transfers or payments made between January 1, 1997 and August 14, 1998 (the "1997 and 1998 Payments").[3]

## II. DISCUSSION:

### A. *The Fraudulent Transfer Claims.*

■ The Trustee seeks to avoid the 1997 and 1998 Payments as fraudulent transfers under both § 548(a)(1)(B) and

§ 544(b) of the Bankruptcy Code. Section 548(a)(1)(B)[4] permits an estate representative to avoid a transfer made or obligation incurred within one year prior to the commencement of the bankruptcy case if: 1) the debtor received less than reasonably equivalent value in exchange for the transfer made or obligation incurred; and 2) the debtor (a) was insolvent at the time the transfer was made or obligation incurred or became insolvent as a result thereof, (b) was engaged in or about to engage in a business or a transaction for which its remaining property constituted an unreasonably small capital, or (c) intended to incur, or believed it would incur, debts beyond its ability to pay as those debts matured. 11 U.S.C. § 548(a)(1)(B). The Trustee carries the burden of proving each of the foregoing elements by a preponderance of the evidence. *Nickless v. Golub (In re Worcester Quality Foods, Inc.),* 152 B.R. 394, 403 (Bankr.D.Mass. 1993); *Fitzgerald v. Cheverie (In re Edward Harvey Co.),* 68 B.R. 851, 856 (Bankr.D.Mass.1987).

■ Section 544(b)[5] provides another approach. It permits the estate represen-

---

3. The Court notes that the Trustee did not present any evidence as to the amount paid by the Debtor for Pitocchelli's automobile lease or life insurance policy during this period. The Court will assume that the Trustee has waived or is not asserting claims with respect thereto.

4. 11 U.S.C. § 548(a)(1)(B) provides:
 (a) (1) The trustee may avoid any transfer of any interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
 . . . .
 (B) (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
 (ii) (I) was insolvent on the date that such transfer was made or such obligation was

incurred, or became insolvent as a result of such transfer or obligation;
 (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or
 (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

5. 11 U.S.C. § 544(b)(1) provides:
 Except as provided in paragraph (2), the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

tative to wear the mantel of any actual unsecured creditor who could have avoided a prepetition transfer under "applicable [non-bankruptcy] law." The Trustee relies (with respect to the 1997 and 1998 Payments) on § 6(a) of the Massachusetts Uniform Fraudulent Transfer Act ("UFTA"), which provides that:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

Mass. Gen. Laws Ann. ch. 109A, § 6(a) (West 1999). Again, the Trustee carries the burden of proving each of the foregoing elements by a preponderance of the evidence. *Ferrari v. Barclays Business Credit, Inc. (In re Morse Tool, Inc.),* 148 B.R. 97, 131 (Bankr.D.Mass.1992)

■ In many respects, the Massachusetts UFTA § 6(a) mirrors Bankruptcy Code § 548(a)(1)(B). *Campana v. Pilavis (In re Pilavis),* 233 B.R. 1, 10 (Bankr. D.Mass.1999); *Leibowitz v. Parkway Bank & Trust Co. (In re Image Worldwide Ltd.),* 139 F.3d 574, 577 (7th Cir.1998). However, critical differences exist. For avoidance of the challenged payments pursuant to UFTA § 6(a), the Trustee's derivative

standing under § 544(b) is dependent on the existence of at least one actual unsecured creditor who could have avoided the challenged transfers. Section 548(a)(1)(B) does not require the existence of such a creditor. Furthermore, avoidance actions under § 6(a) of UFTA must be brought within four (4) years from the date of the transfers. *Carpenter v. Granderson (In re Granderson),* 214 B.R. 671, 672 (Bankr. D.Mass.1997); Mass. Gen. Laws Ann. ch. 109A, § 10. Section 548(a)(1)(B), on the other hand, reaches back only to those transfers made within one year of case commencement.

### 1. *The Payments Made From August 15, 1997 to August 14, 1998:*

As to the payments made to and on behalf of Pitocchelli within one year of case commencement, the Trustee relies on § 548(a)(1)(B) and § 6(a) of the Massachusetts UFTA (derivatively through § 544(b)) and argues that the Debtor was insolvent or became insolvent as a result thereof and that the Debtor received no reasonably equivalent value for those payments.[6]

### A. Insolvency

■ For purposes of the Bankruptcy Code, a debtor is "insolvent" when "the sum of such entity's debts is greater than all of [the] entity's property, at a fair valuation ... [.]" 11 U.S.C. 101(32) (in relevant part). The definition afforded by

---

**6.** The Trustee has not argued any alternative ground under § 548(a)(1)(B) or § 6(a) of the Massachusetts UFTA for avoidance of the payments. According to the parties' stipulated *Joint Pre–Trial Statement,* dated September 17, 1999:

C. The following issues of law, and no others, remain to be litigated:

. . . .

2. Pursuant to 11 U.S.C. § 548, whether the transfers from Tri–Star to Pitocchelli were for less than reasonably equivalent

value and, if so, whether Tri–Star was insolvent on the dates of such transfers or became insolvent as a result thereof.

. . . . .

4. For transfers occurring after October 1996, pursuant to 11 U.S.C. § 544(b) and M.G.L.A. c. 109A, § 6(a), whether the transfers from Tri–Star to Pitocchelli were for less than reasonably equivalent value and, if so, whether Tri–Star was insolvent on the dates of such transfers or became insolvent as a result thereof.

the UFTA is no different, except that a general failure by the debtor to pay its debts as they become due provides a basis for a presumption of insolvency. *See* Mass. Gen. Laws Ann. ch. 109A, § 3(a)-(b). Pitocchelli does not seriously dispute that Tri–Star was insolvent for at least one year prior to August 14, 1998. And the evidence presented by the Trustee, from which this Court could and does infer the Debtor's insolvency within one year prior to the filing of this case, was substantial.

The Debtor's audited financial statement, reflecting the Debtor's financial condition as of December 31, 1996, exhibited a positive net worth of $1,204,228. However, persuasive testimony revealed that correction for a combination of inventory overevaluation (off by approximately $1,233,000) and underestimation of doubtful accounts (off by approximately $300,000) would have revealed a negative net worth at that time. And history revealed that the fortunes of the company actually plummeted thereafter as the Debtor failed increasingly to be able to meet its obligations as they became due.

■ Pitocchelli repeatedly argued in his pleadings that the Debtor was solvent from April 1994, when the Consulting Agreement was signed, through "at least" June of 1997. But this Court's focus should be on the state of the Debtor's solvency when the Debtor actually transferred value. *Mellon Bank v. Official Committee of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.)*, 92 F.3d 139, 154 (3rd Cir.1996); *Enwotwen Indus., Inc. v. Brookstone Ltd. Partnership (In re Newtowne, Inc.)*, 157 B.R. 374, 380 (Bankr. S.D.Ohio 1993). *Cf. Taylor v. Riverside–Franklin Properties, Inc. (In re Taylor)*, 228 B.R. 491, 500 (Bankr.M.D.Ga.1998),

quoting 5 KING, COLLIER ON BANK-RUPTCY, ¶ 548.02[2], p. 548–13 (15th ed.1998) ("the 'moment of importance [is] the actual time at which the estate is diminished from the creditors' viewpoint." '). In this regard, the Trustee carried her burden of proof. This Court finds that in and after January of 1997, the Debtor was insolvent under the definition afforded by § 101(32) of the Bankruptcy Code and/or that provided by UFTA § 3(a), aided by the presumption afforded by § 3(b).

## B. Reasonably Equivalent Value

■ Of greater complexity is whether the Debtor received reasonably equivalent value in exchange for the payments made by the Debtor during the year prior to the filing of the bankruptcy petition. The Bankruptcy Code provides no definition to guide this Court in the application of the term "reasonably equivalent value." [7] However, courts have uniformly held that a reasonably equivalent value determination should be based on all of the facts and circumstances of the case. *In re Taylor*, 228 B.R. at 501; *Hirsch v. Steinberg (In re Colonial Realty Co.)*, 226 B.R. 513, 523 (Bankr.D.Conn.1998); *Joshua Slocum, Ltd. v. Boyle (In re Joshua Slocum, Ltd.)*, 103 B.R., 610, 618 (Bankr.E.D.Pa.1989), *aff'd*, 121 B.R. 442 (E.D.Pa.1989); *In re Edward Harvey Co.*, 68 B.R. at 858. The Court should "compare what was given with what was received." *Harker, III v. Center Motors, Inc. (In re Gerdes)*, 246 B.R. 311, 313 (Bankr.S.D.Ohio 2000); *Coan v. Fleet Credit Card Services, Inc. (In re Guerrera)*, 225 B.R. 32, 36 (Bankr. D.Conn.1998); *Barber v. Golden Seed Co.*, 129 F.3d 382, 387 (7th Cir.1997). And, in making this determination, both direct and indirect benefits should be considered. *In*

---

**7.** Section 548(d)(2)(A) defines "value" as "property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor[.]"

re Gerdes, 246 B.R. at 313; *Vadnais Lumber Supply, Inc. v. Byrne (In re Vadnais Lumber Supply, Inc.)*, 100 B.R. 127, 136 (Bankr.D.Mass.1989). It is not necessary that there be an exact exchange in order to establish reasonably equivalent value, but the Court "must keep the equitable purposes of the statute firmly in mind, recognizing that any significant disparity between the value received and the obligation assumed ... will have significantly harmed ... innocent creditors ...." *Rubin v. Manufacturers Hanover Trust Co.*, 661 F.2d 979, 994 (2nd Cir.1981).

█ In the present case, the Debtor incurred an obligation to pay Pitocchelli $72,000 per year for almost 7 years, to maintain his health insurance coverage, and to pay for the lease of an automobile. In exchange, Pitocchelli agreed to remain "reasonably available" to provide consulting services, to refrain from competition with the Debtor, to give up his "entitlements" or equity interests, and to release any and all claims he might have against the Debtor and/or Downes.

Although the terms of the Consulting Agreement provide that Pitocchelli was to render future consulting services to the Debtor, this Court finds that the true essence of the Consulting Agreement was not to secure Pitocchelli's future services, but to buy out Pitocchelli's "entitlements" interest. In fact, Downes testified that no specific consulting services were contemplated when the Consulting Agreement was executed. And, for the period in question, it is undisputed that no actual consulting services were requested or rendered. Accordingly, the Debtor failed to receive reasonably equivalent value for the payments made by the Debtor to or on behalf of Pitocchelli from August 15, 1997

to August 14, 1998 for his alleged consulting "availability."

Pitocchelli argues that the Debtor received consideration for the foregoing payments on account of Pitocchelli's release of the "entitlements or participation interests" acquired under the 1993 Memorandum.[8] But Pitocchelli was at no time a shareholder of the Debtor. The 1993 Memorandum provided that Downes was to be the only shareholder and Pitocchelli has cited to no authority which would recognize these "entitlements" as a form of equity or ownership interest under Massachusetts law. At most, Pitocchelli had a claim against Downes for a portion of Downes' equity interest if the company or Downes' stock was ever sold or if the company issued a public offering of stock. The entitlements were, therefore, not a claim against the company. They were actually a promise by Downes to share in the appreciation of his stock interest in the Debtor. Notably, Pitocchelli's releases in the Consulting Agreement ran to Downes as well as to the Debtor.

█ Even if this Court would agree with Pitocchelli that he had ownership or equity interests in the Debtor, reasonably equivalent value to the Debtor would still be lacking for the Debtor's redemption of those interests. Generally, less than reasonably equivalent value is received when a company redeems the equity interests of its principal. *See, e.g., Buncher Co. v. Official Committee of Unsecured Creditors of GenFarm Ltd. Partnership IV*, 229 F.3d 245, 252–253 (3rd Cir.2000); *In re Vadnais Lumber Supply, Inc.*, 100 B.R. at 136; *Consove v. Cohen (In re Roco Corp.)*, 701 F.2d 978, 982 (1st Cir.1983); *Robinson v. Wangemann*, 75 F.2d 756, 757 (5th Cir.

---

**8.** The Defendant seems to argue that there was a redemption of his ownership interests as permitted under the 1993 Memorandum.

1935). Moreover, the equity interests of an insolvent company have generally no value whatsoever. *See, e.g., Le Cafe Creme, Ltd. v. Le Roux (In re Le Cafe Creme, Ltd.)*, 244 B.R. 221, 239–240 (Bankr.S.D.N.Y.2000); *In re Joshua Slocum, Ltd.*, 103 B.R. at 618; *Murphy v. Robinson (In re Ipswich Bituminous Concrete Products, Inc.)*, 79 B.R. 511, 517 (Bankr.D.Mass.1987); *Louisiana Industrial Coatings, Inc. v. Pertuit (In re Louisiana Industrial Coatings, Inc.)*, 31 B.R. 688, 698 (Bankr.E.D.La.1983). Further, the Debtor was not even a party to the 1993 Memorandum and there is no evidence that the Debtor ever assumed any obligations thereunder. Generally, only parties to an agreement or a contract may be held liable under its terms. *See International Customs Associates, Inc. v. Ford Motor Co.*, 893 F.Supp. 1251, 1256 n. 3 (S.D.N.Y.1995) (a contract cannot bind a non-party even if it is an intended third-party beneficiary); *Kelly v. Tillotson–Pearson, Inc.*, 840 F.Supp. 935, 944 (D.R.I. 1994) (a non-party to an agreement is not bound by it and cannot breach its terms); *Crabtree v. Tristar Automotive Group, Inc.*, 776 F.Supp. 155, 166 (S.D.N.Y.1991) ("a non-signatory to a contract cannot be named as a defendant in a breach of contract action unless it has thereafter assumed or been assigned the contract."). Although Downes may have had the power to bind the Debtor in a contract with Pitocchelli, Downes signed the 1993 Memorandum in his individual capacity, not in his capacity as agent or corporate officer of the Debtor. The Debtor was a separate legal entity from its shareholder even though only one shareholder existed.

*Zimmerman v. Eagle Mortgage Corp.*, 110 Ohio App.3d 762, 771, 675 N.E.2d 480, 485 (1996). Therefore, the Debtor did not receive any value from Pitocchelli's release of his entitlements or claims relating to them.

The non-competition and confidentiality portions of the Consulting Agreement cannot be dispatched so easily. The Trustee maintains that Pitocchelli had no real access to confidential information and Downes testified that, like the consulting services, attainment of the covenant not to compete was not the Debtor's real goal under the Consulting Agreement. However, the Trustee has the burden of proof, and the Trustee has not successfully demonstrated that the Debtor failed to receive reasonably equivalent value for payments made on account of the covenant not to compete.[9]

Pitocchelli had a considerable amount of experience in the circuit board industry, he had access to the Debtor's customers, he remained in Massachusetts where the Debtor did business, and he was clearly in a position to compete successfully (or offer his services to a competitor). *Cf. Beaver Bolt Inc. v. Commissioner*, T.C. Memo, 1995–549 (factors that can be considered in evaluating a covenant not to compete for tax purposes include: (a) the ability to compete, (b) intent to compete, (c) economic resources, (d) potential damage if there is competition, (e) experience or expertise in the industry, (f) contacts and relationships with customers, suppliers, and other business contacts, (g) interest in eliminating competition, (h) the duration and geographic scope of the covenant, and (i) in-

---

**9.** Pitocchelli also argues that the doctrine of promissory estoppel can be substituted for "reasonably equivalent value" and that he may take advantage of the "good faith" exception under § 548(c). Because this Court finds that the Trustee has failed to demonstrate that the Debtor did not receive reasonably equivalent value for payments made on account of the covenant not to compete, the Court need not address these additional defenses.

tent to reside in the same geographic area); *In re Worcester Quality Foods, Inc.*, 152 B.R. at 403–404 (non-competition agreement between debtor company and debtor's founder held to have no significant tangible value to the debtor because founder had previously retired and chances of his working for anyone other than the debtor were slim); *In re Turner*, 147 B.R. 989, 995 (Bankr.D.Wyo.1992) (no value assigned to taxpayer's covenant not to compete for tax purposes where there is no agreement between the parties to allocate portion of the purchase price to the covenant and taxpayer did not have the ability to compete). Finally, it is noteworthy that the Consulting Agreement separately allocated consideration for the covenant not to compete.

In light of the foregoing, the Trustee may avoid and recover the transfers made to Pitocchelli directly or on his behalf for the year prior to the commencement of this case, less those monies paid by the Debtor on account of the covenant not to compete. Because the burden of proof is on the Trustee and there is no showing as to allocation, if any, of the payments made

from August 15, 1997 to August 14, 1998, the Court will reduce the Trustee's payments by $12,000, the amount due to Pitocchelli on account of the covenant for the relevant period.

2. *The Payments Made From January 1, 1997 to August 14, 1997:*

■ As to those payments made to or for Pitocchelli more than one year prior to case commencement, the Trustee must rely exclusively on the UFTA, derivatively through § 544(b). As already mentioned, under § 544(b), the Trustee succeeds to the rights of an actual unsecured creditor who could have avoided under UFTA the payments made to or on behalf of Pitocchelli. The burden is on the Trustee to demonstrate the existence of such a qualified unsecured creditor.[10] *Lassman v. Goldstein (In re Goldstein)*, 194 B.R. 1, 2–3 (Bankr.D.Mass.1996); *In re Morse Tool, Inc.*, 148 B.R. at 131. The Trustee's action is based on § 6(a) of the UFTA, which limits avoidance rights to those creditors whose claims "arose before the transfer"

---

**10.** Courts disagree as to whether a trustee is required to establish the existence of a specific creditor in order to have standing under § 544(b). *Compare Le Cafe Creme, Ltd. v. Le Roux (In re Le Cafe Creme, Ltd.)*, 244 B.R. 221, 238 (Bankr.S.D.N.Y.2000) (the burden is on the trustee to demonstrate the existence of an actual creditor with a viable cause of action against the debtor); *Lassman v. Goldstein (In re Goldstein)*, 194 B.R. 1, 2–3 (Bankr.D.Mass. 1996), citing to *Ferrari v. Barclays Business Credit, Inc. (In re Morse Tool, Inc.)*, 148 B.R. 97, 131 (Bankr.D.Mass.1992) (trustee bears the burden of proving the existence of qualified unsecured creditor); *Young v. Paramount Communications, Inc. (In re Wingspread Corp.)*, 178 B.R. 938, 945–946 (Bankr. S.D.N.Y.1995) (before a trustee is able to utilize applicable state or federal law referred to in § 544(b), there must be allegation and ultimately a proof of the existence of an actual unsecured creditor who would have standing

to challenge the transfer); *Smith v. Shoemaker (In re Smith)*, 120 B.R. 588, 590 (Bankr. M.D.Fla.1990) (same) *with Leibowitz v. Parkway Bank & Trust Co. (In re Image Worldwide Ltd.)*, 139 F.3d 574, 577 (7th Cir.1998), citing to *In re Leonard*, 125 F.3d 543, 544 (7th Cir.1997) (the trustee need not identify a specific creditor who could set aside the transfer so long as the unsecured creditor exists).

This Court agrees with those cases which hold that the estate representative must identify the existence of a relevant creditor and respectfully disagrees that this necessary predicate can be established by the Court's inferences with respect to the state of the case file. Standing is an essential element of a § 544(b) action and this Court ought not take judicial notice of a missing element of a party's proof by "poking around" in the case files after the close of the evidence and without affording prior notice to and an opportunity to be heard by the party prejudiced thereby.

in question.[11]

 Only one relevant creditor was referenced by the Trustee during the trial; namely, a medical services company. Without objection, the Trustee elicited testimony to the effect that the medical services company acquired claims against the Debtor commencing in July, 1997, and those claims remain unpaid today. The Trustee presented no evidence of a relevant creditor before that time, nor which day in July was the critical date on which the medical services company claims arose. It was the Trustee's burden to do so. Accordingly, the Court is obligated to give Pitocchelli the benefit of any doubt and rules that the Trustee's standing under § 544(b) commences as of August 1, 1997. The Trustee may go back in time no further. Inasmuch as the Court's analysis above—as to the Debtor's insolvency and the reasonably equivalency of the consideration received by the Debtor for its payments [12]—would apply with the same force and effect to the period of August 1, 1997 to August 14, 1997, the Trustee may avoid and recover the transfers made to or on behalf of Pitocchelli during that period, less those monies paid by the Debtor on account of the covenant not to compete for an additional month. Again, the burden of proof is on the Trustee and there is no showing as to any allocation for the payments made by the Debtor during that period. Therefore, recovery of the payments made from August 1, 1997 to August 14, 1997 should be reduced by $1,000, the full amount due to Pitocchelli per month on account of the covenant.

**B. Breach of Contract:**

 The Trustee asks the Court to find that Pitocchelli breached the Consulting Agreement because the Defendant performed few services from April 1994 to July 1997, and rendered no consulting services from August 1997 to August 14, 1998. The terms of the Consulting Agreement were that Pitocchelli remain "reasonably available" for consultation and he did just that. That may not be reasonably equivalent for the payments received under the Agreement, but the Debtor chose not to utilize the Defendant's availability. "One who prevents the performance of a contract cannot take advantage of its nonperformance." *Frank Fitzgerald, Inc. v. Pacella Bros., Inc.*, 2 Mass.App.Ct. 240, 242, 310 N.E.2d 379, 381 (1974) Also, the Trustee cannot seek and obtain the right

11. Section 5(a) of the UFTA allows broader standing in that it does not condition standing on the timing of the claim. It provides that "A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: 1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or 2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor: (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (ii) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due." However, the Trustee did not bring her action under § 5 of the UFTA, and this Court will not consider its application to the facts of this case.

12. The only difference here is that both Downes and Pitocchelli testified that Pitocchelli rendered some limited services after execution of the Consulting Agreement and prior to July, 1997. However, the Court deems those services rendered in 1997 (one single telephone consultation) inconsequential in nature. And not only were the services not properly identified in time, but there was no basis supplied by which the Court could value them. To the extent, therefore, that Pitocchelli attempted to assert any offsetting claim under § 548(c), he has failed to establish it.

to avoid the Debtor's obligations under the Consulting Agreement and at the same time expect to enforce its contractual rights. *In re Vadnais Lumber Supply, Inc.,* 100 B.R. at 140.

### III. CONCLUSION:

In light of the foregoing, the Trustee has satisfied her burdens under § 548(a)(1)(B) and § 544(b) as to payments made to Pitocchelli under the Consulting Agreement and payments made on his behalf for medical benefits for the period of August 1, 1997 through August 14, 1998. Therefore, the Trustee may avoid these payments, less $1,000 for each month or part thereof (on account of his covenant not to compete). Regrettably, no evidence was introduced which would allow the Court to do the calculation required. Therefore, unless the parties can stipulate as to the appropriate calculation, a further evidentiary hearing will be set in order to gather evidence for a final determination of damages.